**William Hardin BOGARD, Plaintiff,**

v.

**Thomas D. COOK, former Superintendent of the Mississippi State Penitentiary, et al., Defendants.**

No. GC 73–22–S.

United States District Court,
N. D. Mississippi,
Greenville Division.

Nov. 11, 1975.

David M. Lipman, Lawyers' Committee for Civil Rights Under Law, Washington, D. C., Lawrence Zelle, Robins, Davis & Lyons, Minneapolis, Minn., for plaintiff.

James L. Robertson, Campbell & De-Long, Greenville, Miss., Champ T. Terney, Lyon, Crosthwait & Terney, Indianola, Miss., P. J. Townsend, Jr., Townsend, McWilliams & Holladay, Drew, Miss., Hanion A. Miller, Greenville, Miss., for defendants.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

On March 31, 1969, plaintiff in this action, William H. Bogard, then twenty-two years of age, arrived at the Mississippi State Penitentiary at Parchman to begin serving a term of twenty-five years imprisonment which was imposed upon him following his conviction on a charge of armed robbery in the Circuit Court of Leflore County, Mississippi. During the ensuing months, Bogard was several times subjected to disciplinary measures including segregation in the Maximum Security Unit (MSU) and solitary confinement in the "dark hole". On February 25, 1971, Bogard was shot in the foot by armed inmates who were, pursuant to penitentiary procedure and state law at that time, being used to guard other inmates. Bogard's rifle wound resulted in his hospitalization for approximately one month. On July 7, 1972, Bogard was stabbed in the back by a fellow inmate, one James B. ("Slicker") Davis, and rendered thereby a permanent paraplegic.

The instant action was instituted by plaintiff on March 1, 1973. The defendants in the case ultimately were Thomas D. Cook, Superintendent of Parchman from February 15, 1969 to February 13, 1972; John A. Collier, Superintendent of Parchman from February 14, 1972 to December 1, 1972; Jack G. Byars, Assistant Superintendent of Parchman from September 1968 to November 1972; Dr. Hernando Abril, Medical Director at Parchman at the time of both the shooting and stabbing incidents involving plaintiff; Jay Leland Vanlandingham, Chief Security Officer at Parchman during the dates pertinent to this action; Fred H. Childs, sergeant (supervisory guard) at the camp in which Bogard was incarcerated at the time of the shooting incident; Charles Dougherty and Milton L. Davis, trusty shooters who allegedly shot plaintiff on February 25, 1971; and "Slicker" Davis. United States Fidelity

and Guaranty Company (USF&G) by virtue of fidelity bonds underwritten on the defendants Cook, Collier and Byars, was also a defendant herein.

Jurisdiction is based on 28 U.S.C. § 1343(3) and (4) and causes of action alleged under 42 U.S.C. § 1983, as well as pendent state claims of assault and battery and negligence. Because plaintiff herein was, at the time of the institution of this action, a resident of the State of Illinois, jurisdiction might also be founded on 28 U.S.C. § 1332.

The only state penal institution in the State of Mississippi is located at Parchman, with a satellite unit at Lambert, Mississippi. The main portion of the penitentiary, approximately 16,000 acres, is located in Sunflower County. The prison is primarily a farming operation, producing cotton, soybeans, livestock, poultry, and numerous other agricultural products. At least until two years ago, and unquestionably during the years in issue in this case, Parchman was expected to and did operate on a fiscally self-sustaining basis. § 47–5–1, Miss.Code Ann. (1972).

During the years pertinent to this suit, Parchman's superintendent was appointed by the state penitentiary board. Mississippi statutes invest the exclusive management and control of the prison system in the superintendent. § 47–5–23, Miss.Code Ann. (Supp.1974).

The inmate population at Parchman vacillates around the figure 1900. During the period of Bogard's incarceration, the number of civilian employees was limited to 150. Laws 1964, ch. 378, § 42; 1966, ch. 445, § 30 (repealed 1974). All inmates, except those lodged in MSU, are housed in moderate security facilities resembling barracks or dormitories. There were twelve barracks or "camps" within the penitentiary with four civilian employees assigned to each camp. The supervisory civilian employee at each camp is known as a "sergeant". During the years here in question, the security

and operation of the camps at Parchman were, to a large extent, dependent upon the use of trusty shooters (armed inmate guards), trusties (unarmed assistants to the prison's civilian employees) and half-trusties (primarily errand boys).[1]

The complaint contained several causes of action including claims that the defendants, acting under color of state law, inflicted cruel and unusual punishment upon Bogard, that Bogard was subjected to summary punishment thereby depriving him of due process of law, and that the defendants' wilful, wanton and grossly negligent manner of operating the penitentiary was a proximate cause of Bogard's shooting and stabbing injuries.

Regarding the shooting incident, plaintiff claimed that the defendants Cook and Byars were negligent or reckless in the performance of their duties as superintendent and assistant superintendent because, among other shortcomings, they failed to hire sufficient civilian employees and administered the trusty-shooter program in such a way that Davis and Dougherty were appointed as trusty-shooters without sufficient information as to their backgrounds and qualifications. The claim against Vanlandingham and Childs was that, in relation to the shooting incident, those defendants negligently allowed Davis and Dougherty to inflict the injury upon the plaintiff.

Regarding the stabbing incident, the complaint alleged that defendants Collier and Byars were guilty of gross negligence in the manner in which they operated the penitentiary including the employment of the defendant T. T. Peeks as sergeant at the camp where the stabbing occurred. The complaint also raised the issues of whether Collier and Byars were negligent in failing to employ sufficient civilian guards at the penitentiary and whether the inmate classification and assignment system, which allowed the defendant "Slicker" Davis to be placed in the same camp with plaintiff,

---

[1]. For a more detailed account of the operation of Parchman during the time period relevant to this case, see *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss.1972), 501 F.2d 1291 (5th Cir. 1974).

was administered in a negligent manner. The medical care which the plaintiff received after both the shooting and stabbing incidents was also attacked in the complaint. Plaintiff claimed that both superintendents, Cook and Collier, were negligent in the selection of Dr. Abril as the Medical Director at Parchman. According to plaintiff, Abril was incompetent as a medical doctor and guilty of malpractice in failing to provide plaintiff adequate medical care in regard to both the shooting and stabbing incidents.

Trial in the case was to the court and a six-person jury. It began September 10, 1974, and concluded October 7, 1974. Presentation of the evidence consumed fourteen working days. The case was submitted to the jury on a special verdict with thirty-six interrogatories and the partially complete verdict was accepted by the court after four days of deliberation by the jury.

The testimony introduced at the trial was largely undisputed as to the facts surrounding the shooting injury inflicted upon the plaintiff. On February 25, 1971, Bogard was incarcerated at Camp Eight at Parchman. On that date, there was some disturbance in the process of rounding up the inmates of the camp to go to work. Under the general supervision of the defendant Childs, two trusty shooters, Davis and Dougherty, discharged their rifles in order to hasten certain of the inmates as they boarded a truck. In the course of the shooting, Bogard's foot was either struck directly by a projectile from the rifle of one or both of the trusty shooters, or was hit by a ricochet from the rifle of one or both of the trusty shooters.

The testimony as to the immediate circumstances surrounding Bogard's stabbing was also largely undisputed. Because of the shooting injury to his foot, Bogard was assigned to the disability facility, Camp Two. On March 21, 1972, Bogard was appointed to half-trusty status at that camp. In that capacity, it was incumbent upon him to assist the civilian guards calling the roll for work each day, prepare sick call leaves, fill out reports, keep records of inmates' accumulation good time, dispense medication, handle mail, assist on visiting days, and generally carry out the camp sergeant's orders. At this time, defendant Peeks was the sergeant at Camp Two.

At the time of Bogard's promotion to half-trusty, the defendant Slicker Davis was an inmate at Camp Two. Slicker was a "gunman" at the camp, that is, he was a member of the general inmate population and was not a trusty or half-trusty. He was subject to being watched by an armed guard and was not allowed the general run of the penitentiary.

Although there was some testimony as to previous animosity between Slicker Davis and Bogard, it is undisputed that the incident which provoked the final tragic altercation between the two involved a sewing machine which Davis kept in his living quarters in violation of the camp sergeant's rules. Ultimately Bogard informed Peeks of Davis's transgression which led to Peeks depriving Davis of the use of his sewing machine. The same day Davis was forced to remove his machine, and in apparent revenge for Bogard having informed on him, Davis approached Bogard from the rear and imbedded a knife in him with such force that the blade broke off in Bogard's back.

Following the stabbing, Bogard was carried to the prison infirmary where he was treated by Doctors Abril and Juliao. The doctors attempted to extract the portion of the knife still in Bogard's back but were unable to do so, apparently because the wound was deep and the blade irregular in shape. The adequacy of medical treatment which Bogard received at this time was in contention at the trial; however, it was uncontroverted that the knife blade was eventually removed by one "Boss" Stapleton, a prison inmate of notorious physical strength. Bogard was subsequently transferred to the University of Mississippi Hospital in Jackson, where he underwent additional surgery. At the University Hospital, it was determined that the knife blade had

severed Bogard's spinal cord almost completely, thereby rendering him a permanent paraplegic.

On August 4, 1972, the Governor of Mississippi suspended the remainder of Bogard's sentence and Bogard was transported to his parents' home in Harvey, Illinois.

Evidence and testimony were presented at the trial concerning other incidents involving Bogard which occurred prior to his being shot in February of 1971. Most involved the infliction of summary punishment upon the plaintiff by trusties and camp sergeants. There was also testimony that Bogard was frequently relegated to the "dark hole" for punitive purposes during this time period. Some evidence was introduced to the effect that Bogard was forced to stand on a wooden soft drink crate for three consecutive days.

Other factual issues in contention and upon which testimony was offered included whether Bogard received proper medical treatment for his foot injury of 1971; whether the defendants Cook and Collier were actually or constructively aware of the violent propensities of the defendant Slicker Davis prior to the stabbing incident; and the propriety of the assignment of Slicker Davis to work at the prison slaughter house where he had access to, and apparently obtained, the knife which he used to stab Bogard. The adequacy of tool control at the slaughter house was also placed in issue. In short, the plaintiff placed in controversy, and the defendants responded to, practically every facet of the operation of the Mississippi State Penitentiary at Parchman during the years 1968 through 1972. Other issues included the adequ ᵥcy of medical facilities and the competency of medical personnel, the punitive

isolation of inmates, the use of armed inmates (trusty-shooters) as guards, the use the defendants Cook and Collier chose to make of certain funds at their disposal pursuant to § 74–5–91, Miss. Code Ann. (1972),[2] the failure of the state legislature to appropriate sufficient and adequate funds for the operation of the prison, the competency of the persons appointed to administer the operation of the prison, the segregation of prison inmates according to race, the alleged failure of prison officials to hire competent civilian guards in sufficient number, and the use of unarmed prison inmates as half-trusties to assist in the operation of the prison. These issues and others which escape the court's memory at present were litigated in this lawsuit to a greater or lesser degree.

Following the lengthy trial in this cause, and after jury deliberation of approximately four days, the court accepted a verdict from the jury which was not complete in all respects. Because the special verdict with interrogatories is quite lengthy and because some knowledge of the verdict is perhaps essential to an understanding of the court's disposition of the matters *sub judice*, a copy of the verdict as returned by the jury is attached as an appendix to this opinion.

In summary, the jury found that the plaintiff was subjected to cruel and unusual punishment during the term of his incarceration at Parchman. Although the jury made no specific finding to the effect that the plaintiff suffered injury as a result of the imposition of the punishment, it did find that, among all the defendants, only Cook and Byars were involved in or responsible for subjecting Bogard to cruel and unusual punishment.

The jury also found that during his incarceration, plaintiff was deprived of

**2.** The superintendent is authorized and directed to provide for transportation of children of employees of the Mississippi State Penitentiary both in Sunflower County and Quitman County to an elementary or secondary educational institution, and to pay for such transportation out of the support and maintenance fund of the penitentiary. The superintendent shall further pay, in his discretion, to any ele-

mentary or secondary educational institution in which said children are sent an amount not to exceed sixty dollars ($60.00) per student per month as tuition, which also shall be paid out of the support and maintenance fund of the penitentiary. Any student who receives benefits under this section shall not be eligible for any other educational financial state grant or loan.

due process of law, but again failed to agree upon a finding as to whether plaintiff suffered any injury as a result thereof. The defendants Cook, Collier, Byars, Childs, Dougherty and Milton Davis were found to have been acting under color of law in depriving plaintiff of his constitutional right to due process of law.

In answer to an interrogatory, the jury found that the defendant Cook was negligent in performing his duties as superintendent of Parchman and that his negligence was a proximate cause of the shooting injuries sustained by plaintiff on February 25, 1971. The jury failed to answer the interrogatory as to whether such negligence was wilful, wanton or gross.

The jury found that the defendant Byars was negligent in performing his duties as assistant superintendent at Parchman, but failed to find that his negligence was a proximate cause of either the shooting or stabbing injury to Bogard.

The defendant Collier was found to have been negligent in performing his duties as superintendent at Parchman and his negligence was found to be a proximate cause of the stabbing injuries sustained by the plaintiff on July 7, 1972. The jury was apparently unable to agree as to whether Collier's negligence was wilful, wanton, or gross.

As to the defendant Childs, the jury found he had performed his duties as sergeant at Camp 8 in a negligent manner and that his negligence was a proximate cause of the shooting injury to Bogard in 1971, but found that Childs's negligence was not wilful, wanton or gross.

The defendant Vanlandingham was found to have been negligent in performing his duties as chief security officer, but his negligence was not found to be a proximate cause of injury to the plaintiff. The defendants Dougherty and Davis were both found to have been negligent as to the shooting injury to Bogard. The negligence of these two defendants was found to have been both a proximate cause of the shooting injury to the plaintiff and wilful, wanton, or grossly negligent.

The defendant Peeks was acquitted of any negligence in regard to his activities as sergeant at Camp Two, the disability camp wherein Bogard was stabbed.

The jury found that Dr. Abril did not fail to exercise the proper degree of care in treating plaintiff's gunshot wound of February 25, 1971, but did find that Dr. Abril's treatment of plaintiff's stab wound of July 7, 1972, was lacking in skill and care. However, the jury made no finding as to whether this failure on the part of Abril proximately caused any injury to plaintiff.

The jury found that the sum of $20,000 would compensate Bogard for the cruel and unusual punishment inflicted upon him during the tenure of the defendant Cook as superintendent at Parchman. A like sum was found to be proper to compensate plaintiff for the infliction of cruel and unusual punishment upon him while the defendant Collier was superintendent. The jury further found that $20,000 was adequate compensation to Bogard for deprivation of due process of law during Cook's superintendency and another $20,000 was awarded for similar deprivation in the course of Collier's superintendency prior to the stabbing. The jury found that Bogard was entitled to another $20,000 as compensation for the injuries suffered by him in the 1971 shooting and the sum of $400,000 was agreed upon by the jury as a proper recovery for the damages suffered by Bogard in the stabbing incident.

On the basis of the foregoing jury verdict, on December 10, 1974, the court entered judgments against the defendants Cook, Collier, Byars, Childs, Dougherty, Milton Davis, "Slicker" Davis, and USF&G. Judgments were entered in favor of the defendants Vanlandingham, Abril and Peeks. On December 20, 1974, motions for judgment notwithstanding the verdict of the jury and/or new trial were filed on behalf of all defendants against whom judgment had been en-

tered with the exception of Dougherty. Counsel for the parties later submitted extensive and informative memoranda to the court concerning the merits of the pending motions, and oral argument was had on September 2, 1975. The court is now prepared to rule on these post-judgment motions.

 Disposition of the motions *sub judice* has given the court cause to carefully consider the evidence introduced at trial. Upon mature reflection, the court has concluded that the evidence presented on the issue of whether the defendants Cook, Collier, and Byars acted in a wilful, wanton, or grossly negligent manner in connection with the shooting and stabbing injuries to plaintiff and the claims concerning violations of the plaintiff's constitutional rights was insufficient to create a jury question on those points. In reaching this determination, the court has attempted to strictly adhere to the standard governing the granting of a directed verdict set forth in *Boeing Co., v. Shipman,* 411 F.2d 365

(5th Cir. 1969).[3] After due deliberation on the matter, the court is of the opinion that a verdict should have been directed on this issue in favor of the aforementioned defendants during the course of the trial.[4]

In determining that this issue should not have been submitted to the jury, the court has pursuant to *Boeing,* considered all the evidence introduced at trial in the light most favorable to plaintiff and given plaintiff the benefit of all of the legitimate inferences which may be drawn in his favor from that evidence. 411 F.2d at 374–75.

In reaching its conclusion on this question, the court was first required to determine just what is meant by the terms wilful, wanton, or gross negligence.

Gross negligence has been defined as

[t]he intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another; such a gross want of care and regard for the rights

---

**3.** On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. . . . [A] mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question.

411 F.2d at 374–75.

**4.** During the trial, the court denied motions for directed verdicts on behalf of the defendants made at the close of the presentation of all the evidence in the case. The jury returned no verdict as to whether these three defendants (Cook, Collier, and Byars) acted in a wilful, wanton, or grossly negligent manner in connection with the gunshot and knife wounds which plaintiff suffered, as well as plaintiff's

claims that he was denied due process of law and that cruel and unusual punishment was inflicted upon him. Technically, perhaps the court's ruling on this point should be referred to as granting a judgment notwithstanding the verdict of the jury. However, since there was no jury verdict returned on the issue, the court will refer to its ruling on this question as the granting of a directed verdict pursuant to Fed. R.Civ.P. 50(b).

A further point worthy of note at this time concerns the propriety of granting a directed verdict post-trial on issues upon which the court has previously denied a directed verdict. The court interprets Rule 50(b) to sanction just such a procedure.

Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Fed.R.Civ.P. 50(b).

In *Watkins v. Oaklawn Jockey Club,* 183 F.2d 440 (8th Cir. 1950) and *Lowden v. Denton,* 110 F.2d 274 (8th Cir. 1940), cert. denied, 310 U.S. 652, 60 S.Ct. 110, 84 L.Ed. 1417, it was held proper for a trial judge, having overruled a motion for a directed verdict and submitted issues to the jury, to grant a directed verdict after the return of the verdict of the jury.

of others as to justify the presumption of willfulness and wantonness. Black's Law Dictionary, 4th Ed. (1951).

Professor Prosser would likely take issue with Black's definition of gross negligence on the ground that many courts have distinguished between conduct which is merely grossly negligent and that which may be described as wilful or wanton.

> [I]t is still true that most courts consider that "gross negligence" falls short of a reckless disregard of consequences, and differs from ordinary negligence only in degree, and not in kind. . . . [T]he probability is, when the phrase is used, that it signifies more than ordinary inadvertence or inattention, but less than conscious indifference to consequences . . . Prosser, Law of Torts, 183–84 (4th Ed. 1971).

While Prosser would reserve the terms wilful and wanton to describe conduct somewhat more egregious than the sort of behavior which constitutes gross negligence, to create a jury question on this point, plaintiff must have offered some evidence which would give rise to, in the language of *Boeing*, "a conflict in substantial evidence" as to whether Cook, Collier and Byars were guilty of anything in excess of simple negligence. Although counsel for plaintiff availed themselves of every opportunity to vociferously urge that the defendants' conduct was callous and inhumane in the extreme, the court considers the testimony offered at trial on this point insufficient to establish "a conflict in substantial evidence" as to whether the conduct of Cook, Collier, and Byars exceeded simple negligence.

There was absolutely no evidence introduced at trial which tended to show that any of these defendants (Cook, Collier and Byars) was personally involved in inflicting any punishment, deprivation, or injury whatsoever upon the plaintiff. Any liability which these defendants may have in that regard would be completely vicarious.

The primary allegations of wrongdoing made by plaintiff against these defendants concerned their breach of the duty imposed upon them pursuant to § 47–5–23, Miss.Code Ann. (1972)[5] and other statutes of the State of Mississippi (§§ 47–5–1, 47–5–45) which require the Superintendent of Parchman to exercise reasonable care for the safety and well-being of the inmates in his charge.

In his discussion of wilful, wanton, and reckless conduct, Prosser points out that even "an intentional omission to perform a statutory duty" has been, in several jurisdictions, held insufficient to amount to aggravated or gross negligence. Prosser, *supra*, at 186, citing *Memphis and Charleston R.R. v. Martin*, 117 Ala. 367, 23 So. 231 (1897); *Olson v. Jones*, 172 Cal.2d 539, 342 P.2d 440 (Cal.1959); *Kennedy v. Carter*, 249 S.C. 168, 153 S.E.2d 312 (1967).

Although the court does not feel it is necessary to include a point-by-point discussion of all the evidence presented at trial in regard to the acts or omissions of defendants Cook, Collier and Byars in managing the penitentiary, a discussion of some of the more important allegations and the evidence introduced in connection therewith is perhaps warranted.

Chronologically, plaintiff's first claim set forth in the complaint concerned several incidents of summary punishment imposed upon him by various guards and/or trusties at the prison. While it is clear that prison administrators may, under certain circumstances be

---

**5.** This statute was materially altered by amendment by the legislature in 1974; however, it was in effect at all times pertinent to this lawsuit and read, prior to amendment, as follows:

> The superintendent, hereinafter provided for, shall be vested with the exclusive management and control of the prison system, and all properties belonging thereto, subject only to the limitations of this chapter, and shall be responsible for the management of affairs of the prison system and for the proper care, treatment, feeding, clothing and management of the prisoners confined therein. The superintendent shall have sole authority to employ and discharge employees.

held vicariously liable for the acts of their subordinates, *Parker v. McKeithen,* 488 F.2d 553 (5th Cir. 1974), the subordinates' acts must be notorious and widespread to such a degree that the administrator would have actually or constructively condoned or sanctioned the acts of his underlings. *Holland v. Connors,* 491 F.2d 539 (5th Cir. 1974).

Although there was some testimony that summary punishment such as that administered to Bogard was not unknown to other inmates of the penitentiary, there was absolutely no evidence offered that Cook, Collier, or Byars, ever had any personal involvement or beforehand actual knowledge of any of the incidents of the summary infliction of punishment concerning which testimony was offered. In fact, the evidence disclosed that upon learning of the shooting injury to Bogard (which the court views as one of several possible incidents upon which the jury could have based its finding that Bogard was deprived of due process of law by the summary infliction of punishment), the superintendent at the time, Cook, took immediate action to punish those responsible for the shooting. The evidence offered was simply insufficient to create a jury issue that summary punishment of constitutional proportions was so widespread or prevalent at Parchman as to be within the constructive knowledge of these defendants.

Plaintiff fares no better in that portion of his complaint seeking monetary damages for the infliction of cruel and unusual punishment upon him. There was no evidence offered at the trial which tended to show that these three defendants, or any of them, had actual or constructive knowledge of a notorious or widespread practice among prison employees and trusties of imposing cruel and unusual punishment upon the inmates of the institution. *Holland v. Connors, supra.*

■ A further barrier to plaintiff's recovery of monetary damages (about which more will be said later) was erected, or at least recognized, by the United States Supreme Court in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). There the Court held that to recover monetary damages of a public official under 42 U.S.C. § 1983, there must be a finding that the official acted either in bad faith or in "disregard of settled, indisputable law". 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d at 225. Stated another way, a public official will be liable where he acts intentionally or in bad faith to deprive another person of a constitutional right within the purview of § 1983, and may also be held liable where he, in subjective good faith, acts in disregard of a person's "clearly established constitutional rights." Id. Neither of these criteria was satisfied in the case at bar with regard to plaintiff's claim that the defendants Cook, Collier and/or Byars bear legal responsibility for his deprivation of due process of law and his subjection to cruel and unusual punishment.

In regard to the liability which plaintiff seeks to impose upon Cook, Collier, and Byars in connection with his shooting and stabbing injuries, the court is also of the opinion that the proof was insufficient to create an issue for the jury on the question of whether the defendants acted in a wilful, wanton, or grossly negligent manner in discharging their duties at Parchman.

Because there are, or may be, constitutional questions concerning the shooting incident, i. e., the trusty shooters were imposing summary punishment on Bogard without due process of law, the same considerations as were present in the analysis of the due process and cruel and unusual punishment claims control the court's disposition of the shooting claim. There was no evidence whatsoever that Cook or Byars either constructively or actually sanctioned the use of gunfire as a method of securing compliance with the commonplace and routine orders of the guards and inmates. Rather, all the evidence indicated that any use of firearms by free world employees or trusty shooters was strongly disapproved by the prison management except

in the most serious situations. Penitentiary procedure required the preparation and submission of an incident report whenever shots were fired at the prison.

During the period of time relevant to Bogard's shooting injury, the use of inmates as guards was sanctioned by Mississippi law.[6] As discussed, *supra,* state law at that time also restricted the superintendent to 150 civilian employees with whom to operate the prison. It cannot be argued that Cook and/or Byars acted in bad faith in utilizing a system of inmate supervision which was specifically sanctioned by state law, particularly in view of the superintendent's responsibility to safeguard the approximately 2000 inmates entrusted to his care with a maximum of 150 free world guards. The existence of this statutory authority also tends to blunt any contention that the superintendent disregarded Bogard's clear constitutional rights through Cook's use of the trusty system.

As was true of the due process and cruel and unusual punishment claims, the record in this case is totally devoid of any proof that either Cook or Byars was personally involved in the shooting of the plaintiff. Additionally, and again employing the *Boeing* standard, the evidence offered to demonstrate a widespread practice of shooting or shooting at inmates, which is a condition precedent to the imposition liability on these defendants under *Holland v. Connors, supra,* was simply insufficient to create a jury issue on the point.

As to the stabbing the evidence introduced at trial concerning the responsibility of Collier and/or Byars for the infliction of this injury upon plaintiff was basically limited to the following: (1) that these defendants improperly administered the inmate classification system which resulted in Bogard and Slicker Davis being confined within the same camp; (2) that the defendants' administration of the classification system also improperly resulted in Slicker Davis's assignment to a job where he had access to knives (the prison slaughter house); (3) that the trusty system was a poor method of running the prison because it inherently resulted in inmates informing on one another which in turn led to violent retribution, and (4) that the prison administrators frivolously and wastefully expended money in some areas while neglecting to purchase a sorely-needed metal detector for use in the slaughter house operation.

In connection with the above allegations, the court has analyzed the relevant evidence pursuant to the teachings of *Boeing* and has concluded that there was no "conflict in substantial evidence" on the question of whether the conduct of these defendants in regard to plaintiff's stabbing could properly be described as wilful, wanton, or grossly negligent. The only intentional act germane to this issue was the superintendent's decision to channel to other areas funds which might have been used to purchase a metal detecting device for use at the slaughter house. However, the evidence was undisputed to the effect that even had the superintendent been so inclined and had the funds been available, a metal detector could not have been procured

6. The superintendent shall carefully guard against the abuse of the practice of making trusties of convicts. An influential, conspicuous or notorious criminal shall in no case be made or employed as a trusty. Laws 1934, ch. 147; 1944, ch. 332, § 46 (repealed April 20, 1971).

The present statute on the subject of inmate trusties was enacted upon the repeal of the above-quoted statute. The current law reads as follows:

From and after July 1, 1974, no inmate at the penitentiary shall serve as a trusty and perform any duties of guarding other inmates to prevent their escape. Prior to the date aforesaid, the superintendent may select a reasonable number of deserving and trustworthy inmates to be used to guard inmates and to supervise their prison work details. The superintendent shall, within the monies appropriated by the legislature, employ a reasonable number of civilian guards to prevent inmates from escaping and in supervising inmates' work details. The [state penitentiary] board is authorized to eliminate the trusty system at a faster and earlier date if deemed feasible and consistent with consolidation procedures and operations as outlined in § 74–5–5.

§ 47–5–143, Miss.Code Ann. (1972).

during the relevant time period insomuch as all metal detectors, at that time, were being supplied to the nation's air carriers for use in thwarting skyjackings.

Finally, pervading the entire analysis of the liability of these defendants for the injuries to plaintiff is what counsel for the defendants refer to as the "operational realities" of Parchman at the time of the incidents. These realities included the statutory ceiling on the number of civilian personnel which the defendants were allowed to employ, the limited funds for operation of the prison which were appropriated by the legislature, and the gross inadequacy and unsuitability of the physical plant at Parchman. The question of the wilful, wanton, or grossly negligent character of the defendants' conduct must be resolved with these "realities" in mind. The court is of the opinion that the evidence offered at trial was insufficient to create a jury issue on the question of the wilful, wanton, or gross negligence of these three defendants. Accordingly, a verdict absolving these defendants of any wilful, wanton, or grossly negligent conduct should have been directed by the court.

Only the defendants Cook, Collier and Byars have the benefit of a directed verdict on this point. The jury acquitted the defendant Childs of any wilful, wanton, or grossly negligent conduct. The court believes that finding to be supported by "a conflict in substantial evidence."

■ The jury found that the defendants Dougherty and Milton Davis acted in a wilful, wanton, and grossly negligent manner in connection with plaintiff's shooting injury of 1971. The court has determined that there was sufficient evidence in the record to sustain that finding. See *Daniels v. State,* 315 So.2d 443 (Miss.1975). Of course, the stabbing injury inflicted on plaintiff by Slicker Davis was a monstrous and despicable act which so far exceeds the bounds of wilful, wanton, or grossly negligent conduct as to not merit discussion.

■ Turning at last to the issues presented in the defendants' motions for judgment notwithstanding the verdict of the jury and/or new trial, the primary question with which the court must deal in order to dispose of the motions is whether the jury's finding to the effect that the defendants Cook, Collier, Byars, and Childs were guilty of simply negligence in connection with the performance of their duties is sufficient to support the imposition of liability upon these defendants under the recent decisions of the United States Supreme Court and the Court of Appeals for the Fifth Circuit concerning the qualified immunity from monetary damages available to certain public officials in lawsuits under 42 U.S.C. § 1983.

These four defendants argue that, insomuch as they were vested with discretionary authority by virtue of their official positions, and since there was no finding that they acted in a wilful, wanton, or grossly negligent manner (and which argument the court has reinforced by directing a verdict on the point in defendants' favor), there is no rule of law which imposes liability for monetary damages on these defendants for acts committed within the scope of the performance of their official duties. In support of their immunity argument, defendants cite the rule initially formulated by the Supreme Court in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and reaffirmed in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) and, most recently, in *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

In applying the applicable law to the facts in the case at bar, the court is impressed with the similarity of the situation of the defendants Cook, Collier, and Byars to the position of the defendant in *O'Connor v. Donaldson.* There, the Court remanded a case involving the superintendent of a state mental hospital to the court of appeals for a determination as to whether the superintendent

was entitled to immunity from liability for monetary damages pursuant to *Wood v. Strickland* and *Scheuer v. Rhodes.* In the opinion of this court, the *O'Connor* decision clearly indicates that, under certain circumstances, these defendants, Cook, Collier and Byars, are entitled to immunity from monetary damages for actions which they might have taken in performance of their official duties at Parchman. Since the defendants here in question were acting in an official capacity which can not possibly be differentiated from that of the defendant in *O'Connor,* this court concludes that there must be certain, as yet undefined, circumstances in which these defendants would be entitled to immunity from damages. That being so, it falls to the court to ascertain whether the circumstances of this case are sufficient to raise the defendants' immunity bar.

The determination of the scope of the defendants' immunity must begin with consideration of the first of the trilogy of Supreme Court cases on the immunity of public officials.

In *Scheuer v. Rhodes,* the Court made the following statement:

[I]n varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation [being] dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords basis for qualified immunity of executive officers for acts performed in the course of official conduct. 416 U.S. at 247–48, 94 S.Ct. [1683], at 1692, 40 L.Ed.2d at 103.

In applying the *Scheuer* test to the case at bar, the court must examine the duties imposed upon and discretion vested in these defendants under the law of the State of Mississippi. An even superficial survey of the statutes of this state

in force during the period of time here in issue regarding the duties of the superintendent of Parchman discloses that, indeed, a great deal of discretion is vested in the incumbent in that office within the sphere of the operation of the penitentiary.

The superintendent . . . shall be vested with the exclusive management and control of the prison system, and all properties belonging thereto, subject only to the limitations of this chapter, and shall be responsible for the management of affairs of the prison system and for the proper care, treatment, feeding, clothing and management of the prisoners confined therein. The superintendent shall have sole authority to employ and discharge employees. Law of June 1, 1964, ch. 378, § 10 [1964] (Repealed 1974).

In the absence of more specific directives as to the management of the prison, it is apparent that the superintendent must possess an abundance of discretionary authority in order to operate, on a day-to-day basis, a facility such as Parchman, with approximately 1900 inmates and at least 150 employees.

Many of the allegations of misfeasance which plaintiff sought to prove concerning these defendants involved the exercise of discretionary authority. For example, whether to purchase a metal detector for use at the slaughter house certainly requires the use of discretion, as does the question of what individuals, if any, shall be elevated to the status of half-trusty and trusty.

From an examination of the Mississippi statutes, *supra,* which were in force during the period of Bogard's incarceration in Parchman and which define and relate to the duties imposed upon the superintendent, the court has concluded that these defendants, Cook, Collier, and Byars, were, pursuant to state law, vested with sufficient discretion and discretionary authority to defeat any attempt to impose liability for monetary damages upon them on the basis of acts taken by them which were entirely within the

scope of their official duties, absent some showing that they acted in subjective bad faith or with intentional disregard of plaintiff's clear constitutional rights. The court's interpretation of the verdict returned by the jury, as modified by the court, compels the conclusion that these defendants did not, in fact, intentionally disregard plaintiff's clear constitutional rights or act in bad faith in any respect which could be considered a proximate cause of plaintiff's injuries or deprivations.

The court has considered the many cases bearing on the legal issues now under consideration which have been decided by the Court of Appeals for this circuit. *Sapp v. Renfroe,* 511 F.2d 172 (5th Cir. 1975); *Faraca v. Clemmons,* 506 F.2d 956 (5th Cir. 1975); *Clemmons v. Gregg,* 509 F.2d 1338 (5th Cir. 1975); *Burton v. Waller,* 502 F.2d 1261 (5th Cir. 1974); *Parker v. McKiethen,* 488 F.2d 553 (5th Cir. 1974) (a case factually very similar to Bogard in that it involved a plaintiff stabbed by a fellow inmate in the Louisiana State Penitentiary); and *Holland v. Connors,* 491 F.2d 539 (5th Cir. 1974). The reasoning in each of these opinions supports this court's determination to grant defendants' motion for judgment notwithstanding the jury's verdict on this point.

In plaintiff's brief on the post-judgment motions, counsel relies heavily upon *Whirl v. Kern,* 407 F.2d 781 (5th Cir. 1969) to support their argument that the jury's finding of simple negligence in the performance of official duties is sufficient to support the imposition of liability for monetary damages upon the defendants. *Whirl* is a case decided prior to *Scheuer v. Rhodes* which imposed liability on a county sheriff under 42 U.S.C. § 1983 and the common law for failure to release the plaintiff, a pre-trial detainee, from custody for more than nine months following the dismissal of all charges against him. The Court of Appeals held that the sheriff had acted within the scope of § 1983 and had committed a wrong against the plaintiff in the nature of tortious false imprison-

ment. The court rejected the sheriff's argument that the imposition of liability was barred by his showing that his failure to release the plaintiff from custody was unaccompanied by intent, bad faith, or malice.

Although the soundness of the *Whirl* opinion on this point has been questioned at least once, *Roberts v. Williams,* 456 F.2d 819, 834 (5th Cir. 1972), cert. denied, 404 U.S. 860, 92 S.Ct. 83, 30 L.Ed.2d 110, and has perhaps been modified to some extent by *Scheuer v. Rhodes, supra,* it did give the court pause in its consideration of the motions *sub judice* insomuch it apparently fails to acknowledge a good faith defense to a 1983 action such as the court has here recognized. However, the court's doubts in that regard were recently dispelled by the well-reasoned opinion in *Bryan v. Jones,* 519 F.2d 44 (5th Cir. 1975). Judge Clark, speaking for the panel, lucidly distinguished the plaintiff's cause of action in that case from those in *O'Connor v. Donaldson, Wood v. Strickland,* and *Scheuer v. Rhodes.* That is, *Whirl v. Kern* and *Bryan v. Jones* deal with false imprisonment claims, whereas the case at bar and the three cases from the Supreme Court named above are concerned with claims of negligent performance of official duty. The *Bryan v. Jones* court dismissed the defendant's argument for immunity with the observation that "[a] sheriff's duty to discharge a prisoner he has no legal right to hold is solely a ministerial task. No discretion reposes in the jailer who imprisons a man the law says should be free and such an officer commits a tort unless he releases his prisoner within a reasonable time of being ordered to do so." 519 F.2d at 46. Accordingly, the imposition of liability in *Whirl v. Kern* and *Bryan v. Jones* without regard to the good faith or reasonableness of the defendant's conduct in performing a ministerial duty has little or no precedential or persuasive value in a case such as this involving public officials charged with negligent performance of duties which must be held to be largely discretionary in nature.

In the opinion of the court, the jury's finding that the defendant public officials' negligent performance of their duties was a proximate cause of plaintiff's injuries is insufficient to support the imposition of liability for monetary damages upon them pursuant to 42 U.S.C. § 1983. The court's task does not end there, however, since the plaintiff's pendent claims under the common law of the State of Mississippi must also be considered.

In replying to the interrogatories propounded to them by the court, the jury found that the negligence of Cook, Collier and Byars in the performance of their duties was the proximate cause of the shooting and stabbing injuries to plaintiff. The court, being *Erie*-bound, must apply Mississippi law on the question of negligent performance of duty by a state official in order to determine if the jury's findings are sufficient, as a matter of law, to support the judgment for plaintiff which the court has previously entered.

In support of the argument that simple negligence is sufficient under the law of this state to impose liability upon Cook, Collier and Byars, plaintiff cites, *Roberts v. Williams*, 302 F.Supp. 972 (N.D.Miss.1969), *aff'd*, 456 F.2d 819 (5th Cir. 1971) and *Anderson v. Nosser*, 456 F.2d 835 (5th Cir. 1972).[7] The court has carefully examined those opinions and is unpersuaded by plaintiff's argument. *Roberts v. Williams* related to the liability of a county, rather than state, official who was performing specific nondiscretionary duties. Liability in *Anderson v. Nosser* was predicated upon certain *intentional* acts perpetrated by the defendant.

■ The court has concluded that, under the common law of Mississippi, public officials may be required to respond in monetary damages where liability is sought to be imposed upon them on the basis of their performance of discretionary rather than ministerial duties only when they commit wrongful acts beyond the scope of their authority or act in a wilful or malicious manner. *Cochran v. Eakin*, 203 So.2d 587 (Miss.1967); *Golding v. Salter*, 234 Miss. 567, 107 So.2d 348 (1958); *Barnett v. Lollar*, 197 Miss. 574, 19 So.2d 748 (1944); *Stokes v. Newell*, 174 Miss. 629, 165 So. 542 (1936); *Poyner v. Gilmore*, 171 Miss. 859, 158 So. 922 (1935); *National Surety Co., v. Miller*, 155 Miss. 115, 124 So. 251 (1929); and *Lincoln County v. Green*, 111 Miss. 32, 71 So. 171 (1916). Although many of the cited cases involve county, rather than state, officials, the *Barnett* case appears to adopt a test for immunity of public officials similar to that set forth in *Scheuer v. Rhodes*. The *Miller* case, while not proposing a definite test, does enunciate the reasoning employed by the United States Supreme Court in *Scheuer v. Rhodes* to justify a grant of limited immunity to public officials (executive or administrative officials must not be reluctant to take positive action where warranted because of an apprehension of subsequent personal monetary liability).

■ In contending that a finding of simple negligence will support a judgment against the defendants, plaintiff argues that the law of this state imposes a duty upon a sheriff in this capacity as jailer to exercise ordinary and reasonable care for the preservation of the life and health of his prisoners. While language to that effect may certainly be found in *Farmer v. State*, 224 Miss. 96, 79 So.2d 528 (1955) and *Mississippi v. Durham*, 444 F.2d 152, 157 (5th Cir. 1971), the court is not at all convinced that the considerations which justify imposing this standard of care upon a county sheriff warrant the imposition of the same standard upon the superintendent of the only state penal institution in Mississippi.

---

7. "*Anderson v. Nosser* and *Roberts v. Williams* are clear statements by the Fifth Circuit that under Mississippi Negligence Law, the superintendent and employees at Parchman are bound to exercise ordinary and reasonable care in the treatment of those incarcerated." Plaintiff's brief, page 21.

A county sheriff in this state is likely to employ no more than a dozen individuals to assist him in discharging his official duties. It would be rare for a sheriff to have custody of more than two dozen prisoners at any time, at least half of whom would probably be pre-trial detainees rather than persons serving time pursuant to a conviction and sentence of a state court. On the other hand, we have seen that the superintendent at Parchman is charged with the custody of approximately 2000 inmates, all of whom are convicted felons.[8] The superintendent also supervises the staff at the penitentiary which exceeds 150 in number.

Because of the vast difference in the scope of their responsibilities and the fact that a sheriff may have custody of a substantial number of pre-trial detainees to whom a higher standard of care may be owed, the court has concluded, in the absence of any controlling precedent, that the standard of care such as was imposed upon the defendants in *Farmer v. State* and *Mississippi v. Durham, supra* (as well as in *Roberts v. Williams, supra*), is not applicable to the defendants Cook, Collier, and Byars in the case at bar.

Counsel has heatedly discussed the effect of § 47–5–75, Miss.Code Ann. (1972) upon the defendants' liability.[9] The court considers it unnecessary to determine the applicability of this statute to the facts in the case at bar insomuch as the court's recognition of the defendants' immunity defense renders this question moot. In passing, however, the court might state that it is of the opinion that this statute would have no effect upon the defendants' liability under a 1983

claim. In this regard, the court concurs with the reasoning of the court in *Hampton v. City of Chicago*, 484 F.2d 602 (7th Cir. 1973).

The foregoing discussion related to the defendants Cook, Collier, and Byars, and more specifically to the link between those defendants and the stabbing and shooting injuries incurred by the plaintiff. However, the court's reasoning regarding the granting of a judgment notwithstanding the verdict of the jury with respect to defendants' liability to plaintiff for his shooting and stabbing injuries applies with similar force to plaintiff's due process and cruel and unusual punishment claims. That is, the jury's responses to the interrogatories were restricted to findings that the defendants' conduct was limited to simple negligence and the court has directed findings that the defendants were free of the equivalent of bad faith. The scope of the defendants' discretion and responsibilities being the same concerning the due process and cruel and unusual punishment claims as the shooting and stabbing incidents, and the liability of the defendants being similarly vicarious, the qualified immunity afforded defendants likewise bars recovery on the due process and cruel and unusual punishment claims in all instances as to these defendants.

Moving on to the motion for judgment notwithstanding the verdict of the jury and/or new trial filed on behalf of the defendant Fred H. Childs, the jury found that Childs acted under color of law in depriving plaintiff of his constitutional right to due process of law during the

---

**8.** During the period of time relative to his lawsuit, under extraordinary circumstances, pretrial detainees could be remanded to Parchman for safekeeping prior to trial. Laws, 1964, ch. 355 (repealed March 14, 1973); formerly § 47–3–1(2), Miss.Code Ann. (1972).

**9.** The pertinent portion of that statute reads as follows:

The [penitentiary] board shall have the further power and authority, in its discretion, to take adequate liability insurance on

the operation of said penitentiary, including liability insurance to protect the board, the superintendent and other regular employees of the penitentiary from tort actions in any state or federal court, if liability insurance is in effect, may be sued by anyone affected to the extent of such insurance carried; provided, however, that immunity from suit is only waived to the extent of the liability insurance carried and a judgment creditor shall have recourse only to the proceeds or right to proceeds of the liability insurance.

March 31, 1969 to July 7, 1972 time period. The jury further found that Childs negligently performed his duties as sergeant at Camp Eight during the time period relevant to plaintiff's shooting injury (February 24, 1971), but that such negligence was not wilful, wanton, or gross. Considering the facts surrounding the claim against Childs under the tenets of *Scheuer v. Rhodes* and *Wood v. Strickland,* and bearing in mind the jury's specific finding absolving Childs of wilful, wanton or grossly negligent conduct, the court has concluded that as to the due process and negligence claims, Childs was acting in "good faith" and in such a manner as to be immune from monetary damages under *Wood v. Strickland.* There was no evidence offered as to any malice on the part of Childs in regard to his actions while he was camp sergeant. Plaintiff's claim against Childs based upon his negligent operation of Camp Eight, proximately causing plaintiff's shooting injury, must likewise fail due to the absence of a finding of bad faith, gross negligence, or malice on the part of the defendant Childs.

Finally, the court turns to the question of the liability of the defendants Milton Davis, and Charles Dougherty. The liability of Dougherty and Davis is, of course, predicated upon their conduct as trusty shooters, one or both of whom shot Bogard in the leg in 1971. The evidence offered at trial on this point was clearly sufficient to create a jury issue as to the liability of both of these individuals. Additionally, the court notes that no post-trial motion has been filed on behalf of Dougherty. The jury having found that these defendants acted in a wilful, wanton, and grossly negligent manner, the court is satisfied that even if they are entitled to a qualified immunity under *Scheuer-Wood-O'Connor,* their conduct here clearly exceeded the scope of any immunity which they might enjoy. Accordingly, the verdicts against Dougherty and Davis will not be disturbed.

The motion for judgment notwithstanding the verdict of the jury and/or new trial filed on behalf of Slicker Davis is patently without merit. In his testimony at the trial, Davis calmly and unremorsefully admitted inflicting the heinous injury upon plaintiff which has led to his present tragic state of paraplegia. The court does not feel any further discussion of the culpability or liability of this defendant is warranted.

Thus far in this lamentably over-long opinion, the court has attempted to restrict itself to a discussion of the law as the court finds it to presently exist. However, having devoted a significant portion of its time and effort to pre-trial, trial, and post-trial matters in this particular lawsuit, the court cannot terminate its participation in the litigation without giving voice to certain of its aspirations and observations concerning the outcome of the action and the law of the case.

At the inception of this complex case, the court resolved to conduct the trial in such a manner so as to insure that, regardless of the outcome at the trial and appellate levels, it would not be necessary to try the case again. Toward that end, and with an awareness of the unsettled state of the law at the time of trial (Fall, 1974), the court submitted all matters in issue to the jury upon the numerous interrogatories. With hindsight, it is perhaps apparent that additional or more specific interrogatories might have been beneficial to a clear and expeditious disposition of the case; however, the court is absolutely convinced that the outcome of the case as manifested in this opinion would not have been altered in any substantial respect had the ungiven interrogatories which the court now contemplates actually been propounded to the jury.

As a matter of policy, the court deems it unwise to establish a rule of law to the effect that high-ranking officials at the state penitentiary may be held personally liable for monetary damages on the basis of simple negligence in the performance of their official duties. The

court foresees two undesirable consequences of such a rule. First, capable administrators and high-calibre employees would undoubtedly become difficult if not impossible to find when the spectre of such unlimited liability becomes generally known. Second, and secondarily, it appears highly likely that every major and minor injury received by an inmate at Parchman, whether inflicted by a guard or another inmate, will result in a civil action on the docket of this court if liability is to be imposed on the basis of simple negligence.

A final consideration which indicates to the court that the rule of law for which plaintiff here argues, the imposition of personal liability on administrators at the state prison upon the basis of simple negligence, would be unwise and unwarranted is the extent to which the admittedly intolerable conditions at Parchman (and practically every other state prison within a six-state area of this court's jurisdiction) are caused by factors entirely beyond the control of the prison officials or even the Mississippi Penitentiary Board. Conditions at Parchman may be improved and grievous injuries of the sort suffered by plaintiff may be eliminated or reduced only by the expenditure of large sums of money by the state legislature. Indeed, in his latest order in the *Gates v. Collier* case [10] my colleague, Judge Keady, has observed that the most pressing problem at Parchman at this time is the delapidated state of the physical facilities there. It would be absurd, in the opinion of the court, to, on the one hand, impose such a high standard of care upon the Superintendent of Parchman as to create a degree of exposure to personal liability for actions taken in an official capacity which would deter or prohibit capable administrators from accepting the office while, on the other hand, admitting that the real problems with the administration and operation of the prison lie in areas within the exclusive control of the legislature.

In accordance with the foregoing, an order will be entered granting the motions of the defendants Cook, Collier, Byars, Childs and USF&G for judgment notwithstanding the verdict of the jury and overruling the same motions as to the defendants Milton and Slicker Davis.

## APPENDIX

Composite, Conformed Copy of the Verdict of the Jury

### SPECIAL VERDICT WITH INTERROGATORIES

In answering these interrogatories, you are to do so by a preponderance of the evidence:

1. During the period from March 31, 1969 to July 7, 1972, was William Hardin Bogard, Jr., subjected to cruel and unusual punishment?

✓
YES NO

2. If the answer to Interrogatory No. 1 is "yes", did plaintiff suffer injury as a result thereof?

YES NO

3. If your answers to Interrogatories Nos. 1 and 2 are "yes", then indicate which, if any, of the following individuals were acting under color of law in subjecting plaintiff to cruel and unusual punishment:

| | YES | NO |
|---|---|---|
| Thomas D. Cook | ✓ | |
| John A. Collier | | ✓ |
| Jack G. Byars | ✓ | |
| Dr. Hernando Abril | | |
| J. Leland Vanlandingham | | ✓ |
| Fred H. Childs | | ✓ |

10. 349 F.Supp. 881 (N.D.Miss.1972), 501 F.2d 1291 (5th Cir. 1974).

Charles Dougherty — YES ✓ NO

Milton Leroy Davis — YES ✓ NO

4. During the period from March 31, 1969 to July 7, 1972, was William Hardin Bogard, Jr., deprived of his constitutional right to due process of law?

✓ YES — NO

5. If your answer to Interrogatory No. 4 is "yes", did plaintiff suffer injury as a result thereof?

— YES — NO

6. If your answers to Interrogatories Nos. 4 and 5 are "yes", then indicate which, if any, of the following individuals were acting under color of law in depriving plaintiff of his constitutional right to due process of law?

Thomas D. Cook — ✓ YES — NO

John A. Collier — ✓ YES — NO

Jack G. Byars — ✓ YES — NO

Dr. Hernando Abril — YES — NO

J. Leland Vanlandingham — YES ✓ NO

Fred H. Childs — ✓ YES — NO

Charles Dougherty — ✓ YES — NO

Milton Leroy Davis — ✓ YES — NO

7. During the term of his administration was the defendant, Thomas D. Cook, negligent in his duties as Superintendent?

✓ YES — NO

8. If your answer to Interrogatory No. 7 is "yes", state whether such negligence was a proximate cause of:

(a) the shooting injuries sustained on February 25, 1971?

✓ YES — NO

(b) the stabbing injuries sustained on July 7, 1972?

— YES ✓ NO

9. If your answers to Interrogatories Nos. 7 and 8 are "yes", answer this Interrogatory No. 9; otherwise, do not.

Was such negligence willful, wanton or gross?

— YES — NO

10. During the term of his administration was the defendant, Jack G. Byars, negligent in his duties as Assistant Superintendent?

✓ YES — NO

11. If your answer to Interrogatory No. 10 is "yes", state whether such negligence was a proximate cause of:

(a) the shooting injuries sustained by plaintiff on February 25, 1971?

— YES ✓ NO

(b) the stabbing injuries sustained by plaintiff on July 7, 1972?

— YES ✓ NO

12. If your answers to Interrogatories Nos. 10 and 11 are "yes", answer this Interrogatory No. 12; otherwise, do not.

Was such negligence willful, wanton or gross?

— YES — NO

13. During the term of his administration, was the defendant, John A. Collier, negligent in his duties as Superintendent?

✓ YES — NO

14. If your answer to Interrogatory No. 13 is "yes" state whether such negligence

was a proximate cause of the stabbing injuries sustained by plaintiff on July 7, 1972?

✓
—— ——
YES NO

15. If your answers to Interrogatories Nos. 13 and 14 are "yes", answer this Interrogatory No. 15; otherwise, do not.

Was such negligence willful, wanton or gross?

—— ——
YES NO

16. Was the defendant, Fred H. Childs, negligent with respect to his activities as sergeant at Camp 8?

✓
—— ——
YES NO

17. If your answer to Interrogatory No. 16 is "yes", was such negligence a proximate cause of the shooting injury to plaintiff on February 25, 1971?

✓
—— ——
YES NO

18. If your answer to Interrogatories Nos. 16 and 17 are "yes" answer this Interrogatory No. 18; otherwise do not.

Was such negligence willful, wanton or gross?

 ✓
—— ——
YES NO

19. Was J. Leland Vanlandingham negligent in performing his duties as Chief Security Officer?

✓
—— ——
YES NO

20. If your answer to Interrogatory No. 19 is "yes", was such negligence a proximate cause of the shooting injury to plaintiff on February 25, 1971?

 ✓
—— ——
YES NO

21. If your answer to Interrogatories Nos. 19 and 20 are "yes", answer this Interrogatory No. 21; otherwise, do not.

Was such negligence willful, wanton or gross?

 ✓
—— ——
YES NO

22. Was Milton Davis negligent in the performance of his duties as a trusty shooter on February 25, 1971?

✓
—— ——
YES NO

23. If your answer to Interrogatory No. 22 is "yes", was such negligence a proximate cause of the shooting injury to plaintiff?

✓
—— ——
YES NO

24. If your answer to Interrogatories Nos. 22 and 23 are "yes", answer this Interrogatory No. 24; otherwise, do not.

Was such negligence willful, wanton or gross?

✓
—— ——
YES NO

25. Was Charles Dougherty negligent in the performance of his duties as a trusty shooter on February 25, 1971?

✓
—— ——
YES NO

26. If your answer to Interrogatory No. 25 is "yes", was such negligence a proximate cause of the shooting injury to the plaintiff?

✓
—— ——
YES NO

27. If your answer to Interrogatories Nos. 25 and 26 are "yes", answer this Interrogatory No. 27; otherwise, do not.

Was such negligence willful, wanton or gross?

✓
—— ——
YES NO

28. Was the defendant, T. T. Peeks, negligent with respect to his activities as Sergeant of Camp 2?

 ✓
—— ——
YES NO

29. If your answer to Interrogatory No. 28 is "yes", was such negligence a proximate cause of the stabbing injuries received by plaintiff on July 7, 1971?

—— ——
YES NO

30. If your answers to Interrogatories Nos. 28 and 29 are "yes", answer this Interrogatory No. 30; otherwise, do not.

Was such negligence willful, wanton or gross?

<u>YES</u> <u>NO</u>

31. Did Dr. Hernando Abril fail to exercise the degree of medical care required of a physician in the State of Mississippi with respect to the treatment of plaintiff for the gunshot wounds sustained on February 25, 1971?

<u>YES</u> ✓<br> <u>NO</u>

32. If your answer to Interrogatory No. 31 is "yes", was such failure to exercise reasonable care a proximate cause of the injury to plaintiff after the gunshot wound?

<u>YES</u> <u>NO</u>

33. Prior to the initial attempt to remove the knife blade from his back on July 7, 1972, was the damage to Bogard's spinal cord insufficient to render him a permanent paraplegic?

<u>YES</u> <u>NO</u>

34. Did Dr. Hernando Abril fail to exercise the degree of medical skill and care required of a physician in the State of Mississippi in the treatment of plaintiff for the stabbing injury received on July 7, 1972?

✓<br><u>YES</u> <u>NO</u>

35. If your answer to Interrogatory No. 32 is "yes", was such failure to exercise reasonable care a proximate cause of injury to plaintiff after the stabbing?

<u>YES</u> <u>NO</u>

36. What are the damages that will reasonably compensate the plaintiff for the injuries he sustained?

(a) As a result of cruel and unusual punishment which he received, if any:

(1) During the period March 31, 1969 through February 13, 1972?

$ 20,000

(2) During the period February 14, 1972 through July 7, 1972?

$ 20,000

(b) As a result of a deprivation of his constitutional rights to due process of law, if any:

(1) During the period March 31, 1969 through February 13, 1972?

$ 20,000

(2) During the period February 14, 1972 through July 7, 1972?

$ 20,000

(c) As a result of the injuries sustained from the gunshot wound of February 25, 1971?

$ 20,000

(d) As a result of the injury sustained from the stabbing of July 7, 1972?

$ 400,000

Dated: <u>October 7, 1974</u>

<u>/s/ Sarah Morris</u><br>FOREWOMAN

ORDER

Pursuant to the findings of the court as expressed in the Memorandum of Decision this day released in the action sub judice, it is

Ordered and adjudged:

(1) That the motions of defendants John Allen Collier, Jack G. Byars, Fred H. Childs, Thomas D. Cook, and United States Fidelity and Guaranty Company, for judgment notwithstanding the jury's verdict or, in the alternative, for a new trial, shall be and the same hereby are sustained in the respects as follow:

(a) The several judgments entered by the court on December 10, 1974, insofar as the same relate to said defendants shall be and the same hereby are vacated and set aside; and the complaint is dismissed on the merits as to said defendants, who shall recover their costs of plaintiff;

(b) That, as to the named defendants, each shall be and hereby is granted a new trial on the issue of whether the acts and/or omissions of such defendant of which plaintiff complains were wilful, wanton, or grossly negligent, this ruling to take effect only in the event the ruling of the court on the named defendants' motion for judgment notwithstanding the verdict of the jury is reversed on appeal;

(c) That the motions of defendants Milton Davis and James B. Davis for judgment notwithstanding the verdict of the jury, or in the alternative for a new trial, shall be and the same hereby are overruled and denied; and

(d) That, except as herein modified, the judgments of the court entered herein on December 10, 1974, shall remain in full force and effect.