**William Hardin BOGARD, Jr., Plaintiff-Appellant,**

v.

**Thomas D. COOK, Former Superintendent of the Mississippi State Penitentiary, et al., Defendants-Appellees.**

No. 76–2890.

United States Court of Appeals, Fifth Circuit.

Dec. 15, 1978.

David M. Lipman, William E. Caldwell, Washington, D.C., Lawrence Zelle, Thomas C. Kayser, Minneapolis, Minn., for plaintiff-appellant.

James L. Robertson, Greenville, Miss., Champ T. Terney, Indianola, Miss., Pascol J. Townsend, Jr., Drew, Miss., P. Roger Googe, Jr., Asst. Atty. Gen., A. F. Summer, Atty. Gen. of Miss., Jackson, Miss., Hainon A. Miller, Greenville, Miss., for defendants-appellees.

Before CLARK, FAY and VANCE, Circuit Judges.

CHARLES CLARK, Circuit Judge:

William H. Bogard, a former prisoner at the Mississippi State Penitentiary at Parchman, Mississippi ("Parchman"), filed this action to recover civil damages for personal injuries. While a Parchman inmate, Bogard was subjected to a series of corporal punishments and suffered two incidents of prison violence, one a stabbing that severed his spinal cord and rendered him a permanent paraplegic. Bogard sued various supervisory officials, employees and inmates at Parchman, based on 42 U.S.C. § 1983 and pendent state tort claims. A three-week trial ended with a partially deadlocked jury which was able to reach agreement on only 26 of the 36 special verdict interrogatories submitted by the court. The jury's unanswered questions prove crucial to Bogard's appeal.

The district court held that the defendant prison officials and employees were clothed with qualified official immunity, and could be held liable in damages only on a finding of culpability greater than ordinary negligence. Although the jury in its partial verdict found that virtually all of the defendants had been negligent in performing their duties at Parchman, and had acted under color of law to subject Bogard to deprivations of due process or cruel and unusual punishment, the jury also specifically exonerated all but the three highest ranking prison employees from any misconduct more egregious than simple negligence. However, despite several efforts by the court, the jury was unable to reach an agreement on answers to interrogatories that asked whether the three top management level prison officials—Superintendents Cook and Collier and Assistant Superintendent Byars—were guilty of willful, wanton or gross negligence. After finally accepting the incomplete special verdict, the trial court issued a directed verdict in favor of all prison officials on the ground that there was no basis in the record for having submitted the willful, wanton or gross negligence question to the jury.

We agree that a finding of misconduct greater than simple negligence is required to obtain monetary relief against prison supervisors, and hold that the record supports the trial court's directed verdict in favor of the defendants Cook, Collier and Byars. Since it did, the jury's inability to reach agreement on the gross, willful or wanton misconduct interrogatory as to Cook, Collier, and Byars did not necessitate a mistrial. Only the liability of Superintendent Cook and Collier and Assistant Superintendent Byars is discussed throughout this opinion. All of the lower ranking Parchman officials—Vanlandingham, Childs, Peeks, and Abril—were either found not negligent by the jury or not guilty of misconduct greater than ordinary negligence. Because the qualified immunity enjoyed by all the employee-defendants could not be overcome on the basis of simple negligence, the district court could have entered judgments in favor of all officials but Cook, Collier, and Byars based upon the special verdict. The three fellow inmates sued by Bogard—Milton Davis, Charles Dougherty, and James B. Davis—were all found to have injured Bogard with willful, wanton or gross negligence; those defendants do not appeal from the judgments against them.

With the notation of some doubts as to style, the district court captioned its post-trial order in favor of the defendant-appellees as a directed verdict, and not a judgment notwithstanding the verdict. Although a request for a directed verdict in favor of the defendants had been denied at the close of the evidence and a special verdict was accepted, it was partial and key questions remained unanswered by the jury. See Fed.R.Civ.P. 50(b). Because the substance of the district court's action was fully apparent and no party's rights were affected by the style of the order, we do not analyze the technical nicety of whether the judgment is notwithstanding a verdict. For simplicity, we adopt the same terminology and refer to the order as a directed verdict.

## I. THE FACTS

### A. *The Organization of the Parchman Prison*

The Mississippi State Penitentiary at Parchman is the only state prison in Mississippi. At the time Bogard was incarcerated at Parchman, the prison was operated essentially as it had been since 1903.

Most of its 16,000 acres of farm land was devoted to growing cotton, soybeans and other cash crops, and the production of livestock, swine, poultry and milk. Mississippi law required Parchman to be financially self-sustaining, Miss.Code Ann. § 47–5–1. The prison was expected to "operate at a profit at any cost." *Gates v. Collier,* 349 F.Supp. 881, 892 (N.D.Miss.1972).[1] Consistent with this profit expectation, state law limited the number of prison employees to 150, "at such salaries as the penitentiary can afford." Miss.Code Ann. § 47–5–41. At the time of Bogard's incarceration at Parchman, the inmate population numbered approximately 1,900. Two-thirds of the inmates were black, and prison facilities were segregated by race.

Discipline and security at Parchman were maintained through the "trusty system," a form of prison organization mandated by Mississippi law in which certain prisoners were selected to occupy positions ranging from armed guard to errand boy. *See* Miss. Code Ann. § 47–5–143 (1972). In the terminology of the prison, the prisoners at the top of the "inside world" hierarchy were the "trusty shooters," a group of about 150 inmate-guards armed with rifles and charged with the day-to-day guarding of the other inmates. Next came certain unarmed inmates, known simply as "trusties," who assisted the prison's civilian employees in various custodial and administrative capacities. "Hallboys" distributed medicine, delivered mail, and maintained files. "Floorwalkers" and "cage bosses" were charged with enforcing discipline and maintaining peace in the prison barracks; on their recommendation inmates could be punished. "Half-trusties," also unarmed, served primarily as errand boys. The remaining inmates were known as "gunmen."

Parchman was physically divided into 21 separate units, the most important of which were the 12 major residential camps. Only four civilian employees, known as the "free worlders" were assigned to each residential camp. They consisted of a sergeant, who was in charge of the camp; two "drivers," who supervised transporting inmates to and from field work; and one night watchman. Each residential camp contained barracks, known as "cages," with separate wings for gunmen and trusties. Twenty to thirty trusty shooters were assigned to each camp.

Parchman had a separate maximum security unit, which contained a special punishment area where inmates could be sent for violating prison rules. Each of the four wings of the maximum security unit contained 13 cells equipped for two men, with double metal bunks having no mattresses, a lavatory and a commode. In addition, each side of the maximum security unit contained a 6' x 6' cell, known as the "dark hole." The dark hole had no windows, lights, commode, sink or other furnishings. A six-inch hole located in the middle of the concrete floor was provided for disposition of body wastes. A solid heavy metal door closed the cell. Mississippi law specifically authorized use of the dark hole punishment for periods of up to twenty-four hours. Miss.Code Ann. § 47–5–145.

State law vested overall responsibility and control of Parchman in the hands of the prison superintendent. The superintendent, appointed by the state penitentiary board, was exclusively "responsible for the management of affairs of the prison system and for the proper care, treatment, feeding, clothing and management of the prisoners." Miss.Code Ann. § 47–5–23. An assistant superintendent assisted the superintendent in his duties.

1. *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss. 1972), *aff'd* 501 F.2d 1291 (5th Cir. 1974), was a prisoners' class action suit challenging conditions at Parchman. *Gates* is discussed at length in part II(A) of the opinion.

**B.** *Bogard's Injuries and Punishments at Parchman*

A twenty-two-year-old William Bogard arrived at Parchman in March of 1969, convicted of armed robbery and sentenced to twenty-five years' imprisonment. Three years later a permanently paraplegic Bogard left Parchman on the clemency of the Governor. Bogard divides his allegations of injury into three categories: a rifle wound inflicted by a trusty shooter on February 25, 1971, a knife wound inflicted by a fellow inmate on July 7, 1972, and various summary punishments imposed at different times throughout his confinement.

At the time of the shooting incident of February 25, 1971, Bogard was incarcerated at residential Camp Eight at Parchman. It was a cold morning and the prisoners at Camp Eight were demanding that the camp sergeant, defendant Fred Childs, provide them with warmer clothing. When their request was denied, the inmates staged a "buck," a refusal to work. The striking inmates, including Bogard, were ordered to the Maximum Security Unit, and a truck was summoned to transport them.

Pursuant to prison procedure, the truck was parked outside of the camp's "gunline," an imaginary line on the perimeter of the camp identified by markers. An unauthorized crossing of the gunline was considered an escape attempt and could be thwarted by gunfire. To safely cross the gunline and board the truck, a prisoner had to be "hollered out"—authorized to cross the line.

Camp Sergeant Childs and trusty shooters Dougherty and Milton Davis were supervising the loading. Parchman's Chief Security Officer, Jay Leland Vanlandingham, was standing nearby. Bogard and several other prisoners were ordered by Sergeant Childs to cross the gunline and board the truck. The inmates moved slowly. To hurry them up, trusty shooters Davis and Dougherty fired four to five rifle shots. One bullet struck Bogard in the foot. He was hospitalized for one month.

Following the shooting incident, Bogard was transferred to Parchman's disability facility, Camp Two, to recuperate from his gun wound. At Camp Two Bogard was appointed to the position of hallboy, a job in which he performed duties for the camp's sergeant, defendant T. T. Peeks. Bogard's duties included assisting with the daily roll call, preparing reports, keeping records, dispensing medication and handling mail.

In July of 1972, Bogard, in his capacity as hallboy, informed Camp Sergeant Peeks that one of the camp's inmates had a sewing machine in his possession in the "cage" —the camp barracks. That inmate was defendant James B. "Slicker" Davis, one of the camp's regular gunman prisoners. Sergeant Peeks ordered Bogard to go into the cage area and remove Slicker Davis' sewing machine; Bogard obeyed the order. Several hours later Slicker Davis, armed with a boning knife obtained from the slaughterhouse where he worked, stabbed Bogard in the back. Davis struck Bogard with such force that the blade of the knife broke off inside Bogard's back.

Bogard was carried to the prison infirmary, where the two attending doctors disagreed as to whether he should be immediately sent to a hospital outside the prison. It was decided not to send Bogard out of Parchman; he was given a shot of Demerol and the doctors began their attempts to remove the portion of the blade that was still implanted in his spine. The blade was irregular in shape and deeply embedded; after several attempts to extract it failed, one of the attending doctors asked an assistant to find the strongest prisoner in the area and bring him to the infirmary. "Boss" Stapleton, an inmate of notorious physical strength, was summoned. Stapleton grasped the edge of the blade with a clamp and began to pull, lifting Bogard's body off of the table with repeated efforts, until finally the blade came free.

Bogard remained in the Parchman infirmary for three days, and was then transferred to the University of Mississippi Medical Center in Jackson, Mississippi. At the University Hospital it was determined that the knife blade had severed Bogard's spinal cord almost completely, rendering him a permanent paraplegic. On August 4, 1972,

the Governor of Mississippi suspended the remainder of Bogard's sentence and he was taken to his parents' home in Harvey, Illinois.

Unlike the circumstances surrounding Bogard's shooting and stabbing injuries, the facts concerning various summary punishments inflicted against Bogard at Parchman are disputed and unclear. The practices Bogard complains of are imprisonment in the "dark hole," "coke crate punishment" (being forced to stand for a long period of time on a small wooden box), the shaving of his head with sheep shears, and confinement for varying periods of time in the Maximum Security Unit's punishment cell. It is undisputed that Bogard was in fact confined in both the punishment cells and dark hole of the Maximum Security Unit on several occasions, and that it was common practice to shave the heads of inmates confined in the dark hole. Testimony as to whether Bogard was given "coke crate punishment" is not completely clear, although the record does reveal that the coke crate punishment was used from time to time to discipline inmates. Because the exact nature of these summary punishments and the extent to which different defendants were aware of or sanctioned their use are issues central to the disposition of this appeal, a more exacting discussion of the evidence concerning summary punishments is reserved for Part IV of this opinion.

## C. The Trial

Bogard brought his suit for damages against Slicker Davis, the gunman inmate who stabbed him; Charles Dougherty and Milton Davis, the two inmate trusty shooters who fired the rifle shots that resulted in his gunshot wound of February 25, 1971; Sergeant T. T. Peeks, the sergeant in charge of Camp Two when Bogard was stabbed there; Sergeant Fred Childs, the sergeant in charge of Camp Eight who supervised the truck loading there when Bogard was shot; Dr. Hernando Abril, the Medical Director at Parchman who treated Bogard for his shooting and stabbing injuries; Jay Leland Vanlandingham, Chief Security Officer at Parchman; Jack Byars, Assistant Superintendent of Parchman; Thomas Cook, Superintendent at Parchman until February 13, 1972; and John Collier, Superintendent at Parchman from February 14, 1972, through the end of Bogard's custody. Also named as a defendant was the United States Fidelity and Guaranty Company, by virtue of its fidelity undertakings for Superintendents Cook and Collier, and Assistant Superintendent Byars.

Bogard's complaint contained specific allegations of intentional, grossly negligent and negligent misconduct on the part of various defendants in relation to particular events such as the stabbing and shooting incidents, as well as more generalized allegations concerning certain recurring practices and events at the prison. As the trial court phrased it, "the plaintiff placed in controversy, and the defendants responded to, practically every facet of the operation of the Mississippi State Penitentiary at Parchman during the years 1968 through 1972." 405 F.Supp. at 1206. The defendants at the management level of the prison (primarily Collier, Cook and Byars) were alleged to have exhibited "callous indifference to the treatment of prisoners" through the sustained and "knowing maintenance of bad practices and customs." Prison officials were accused of failing to hire competent civilian guards in sufficient number, not providing adequate medical facilities or competent medical personnel, failing to properly classify prisoners for trusty shooter status, acquiescing in the consistent use of rifle fire by trusty shooters to control other inmates, failing to take steps to eliminate the widespread possession of weapons in the general inmate population, not segregating violent and dangerous prisoners from the general inmate population, requiring unarmed half-trusties to assist in the control of violent prisoners, allowing the punitive isolation and indiscriminate disciplining of inmates, maintaining indecent conditions in the punishment cells and dark hole of the Maximum Security Unit, and segregating prisoners by race.

The trial was largely an effort by Bogard to connect his general complaints about the

prison management's operation of Parchman to his specific injuries. Relative to the shooting incident, Bogard alleged that Superintendent Cook and Assistant Superintendent Byars were negligent or reckless in allowing Milton Davis and Charles Dougherty to serve as trusty shooters, because they were appointed without sufficient investigation into their backgrounds and qualifications. Bogard alleged that Cook and Byars were aware of and acquiesced in the use of the type of rifle fire by inmate trusty shooters that took place on the day he was shot but failed to correct such practices, and were negligent in hiring both Childs and Vanlandingham to work at Parchman. Regarding the stabbing, Bogard further alleged that it was the failure of Superintendent Collier (who had recently replaced Cook) and Byars to properly classify inmates according to their propensities for violence, and their use of half-trusty prisoners such as Bogard to assist in the control and supervision of inmates such as Slicker Davis, that led to Davis' vicious attack. Finally, Bogard claimed that the prison officials were aware of and sanctioned his unjustified subjection to the coke crate, dark hole, and Maximum Security Unit punishments.

Bogard asserted that the conduct of the defendants violated his eighth amendment right to be free from cruel and unusual punishment, and his fourteenth amendment right to be free from deprivations of liberty without due process. All of the defendants were also sued for the same conduct in a pendent claim under Mississippi tort law.

### D. *The Incomplete Verdict*

The trial was to a six person jury. Presentation of evidence took three weeks. At the conclusion of the evidence the court prepared a special verdict with thirty-six interrogatories.[2] After a day's deliberation, the court was informed that the jury had answered eighteen of the questions, but was deadlocked on the others. The court accepted the eighteen answers, repeated the

charge and explanations on the unanswered interrogatories, and sent the jury back for further deliberation. This process was repeated several times and some additional answers were brought back, but after four days of delicate prodding by the court it became clear that the jury could not reach unanimous agreement on more than twenty-six of the thirty-six issues submitted. None of the parties assign as error the trial court's acceptance of an incomplete verdict.

As to each defendant, the jury was asked in a series of three separate questions whether the defendant (1) had been negligent in his duties, (2) the negligence was the proximate cause of Bogard's injuries, and (3) the negligence was willful, wanton or gross. While there is room for some confusion both in the logic of the special verdict questions and in the jury's answers to them, we construe the verdict as establishing that Bogard in fact suffered both constitutional and common law injuries in the form of summary punishments, the shooting, and the stabbing, but that all of the employee defendants except Cook, Collier and Byars were found by the jury to have acted within the scope of the qualified immunity on all counts. We further construe the jury's failure to resolve the gross negligence questions with regard to Cook, Collier and Byars as a failure to resolve their qualified immunity defense on all counts.

In capsule, the jury found virtually all of the defendants (Sergeant Peeks being the sole exception) negligent in their duties. However, only the two inmate defendants, trusty shooters Davis and Dougherty, were specifically found grossly, willfully or wantonly negligent. The jury explicitly decided that the lower and middle level prison employees—Vanlandingham and Childs—were not grossly, willfully, or wantonly negligent. As to the alleged gross, willful or wanton negligence of the management level officials—Cook, Collier and Byars—the jury could not agree. Cook and Byars were found to have subjected Bogard to cruel

---

**2.** A complete list of the 36 interrogatories submitted to the jury, and the jury's response to

them, is printed in the appendix to the district court's opinion. 405 F.Supp. 1202, 1218–21.

and unusual punishment, and all defendants save Vanlandingham and Dr. Abril were found to have deprived him of due process. The total jury awards against all defendants amounted to $500,000.[3]

### E. The District Court's Action

In its Memorandum Opinion of November 11, 1975, the district court granted directed verdicts in favor of all defendants except gunman inmate Slicker Davis and trusty shooters Milton Davis and Dougherty. The controlling legal principle in the district court's decision was that the prison employees were entitled to a qualified official immunity defense both under 42 U.S.C. § 1983 and Mississippi tort law. This shield of qualified immunity, the court held, can be pierced only on a showing of misconduct more egregious than ordinary negligence. Guided by this principle, judgment in favor of Sergeants Peeks and Childs and Security Officer Vanlandingham followed as a matter of course, since the jury specifically found that their conduct was not willful, wanton or gross. As to the three management level defendants—Cook, Collier and Byars—the court granted post-trial directed verdicts in this language:

> Disposition of the motions sub judice has given the court cause to carefully consider the evidence introduced at trial. Upon mature reflection, the court has concluded that the evidence presented on the issue of whether the defendants Cook, Collier, and Byars acted in a wilful, wanton, or grossly negligent manner in connection with the shooting and stabbing injuries to plaintiff and the claims concerning violations of the plaintiff's constitutional rights was insufficient to create a jury question on those points. In reaching this determination, the court has attempted to strictly adhere to the stan-

dard governing the granting of a directed verdict set forth in Boeing Co., v. Shipman, 411 F.2d 365 (5th Cir. 1969). After due deliberation on the matter, the court is of the opinion that a verdict should have been directed on this issue in favor of the aforementioned defendants during the course of the trial.

405 F.Supp. 1208.

Bogard appeals from the district court's entry of these directed verdicts, claiming that under both state and federal law the defendants are not entitled to a qualified immunity defense, that the trial court evaluated the defendant's liability under an incorrect standard of care, and that no directed verdict was justified.

## II. PRELIMINARY ISSUES

### A. The Effect of Gates v. Collier

This litigation is not the first lawsuit concerning conditions and practices at Parchman in which William Bogard has been involved. Bogard participated as a member of the plaintiff class in Gates v. Collier, 349 F.Supp. 881 (N.D.Miss.1972) aff'd 501 F.2d 1291 (5th Cir. 1974). Because some overlap exists between matters litigated in Gates and the present suit, both sides now attempt to invoke Gates for their own benefit. Bogard attempts to use the collateral estoppel effects of Gates to establish facts in his favor, while the defendants claim that Bogard's entire suit is barred by Gates as res judicata.

Gates was a class action brought in 1971 on behalf of all prisoners at Parchman against John Bell Williams, then Governor of Mississippi, the Mississippi State Penitentiary Board, and John Collier, one of the present defendants, then Superintendent at Parchman.[4] The suit sought equitable re-

---

**3.** Interrogatory number 36 asked the jury what damages would compensate Bogard for his various injuries. The jury awarded Bogard $20,000 compensation for his cruel and unusual punishments and $20,000 for his deprivations of due process during the Cook administration at Parchman, and another $20,000 for cruel and unusual punishments and $20,000 for deprivations of due process during Collier's adminis-

tration. The jury found, in addition, that $20,000 would compensate Bogard for his shooting injury and $400,000 would compensate him for his stabbing injury.

**4.** Thomas Cook was the defendant Superintendent in the original complaint; Collier was substituted when he took over as Superintendent.

lief from violations of the first, eighth, thirteenth and fourteenth amendments and 42 U.S.C. §§ 1981, 1983, 1985 and 1994. The complaint alleged that the defendants had maintained prison facilities segregated by race, failed to provide adequate housing, sewage disposal, water systems, and medical care, interfered with the inmates' receipt of mail, neglected to protect prisoners from assault from other prisoners, and permitted inadequately trained or disciplined armed trusty shooters to inflict punishment on other inmates. Pursuant to 42 U.S.C. § 2000h–2, the United States Attorney General intervened as a plaintiff in the suit.

The district court certified *Gates* as a Rule 23(b)(1) and (b)(2) class action, and directed that notice of the suit be sent to all Parchman inmates. An individual copy of the notice was given to each defendant at Parchman, including William Bogard, and additional copies were posted at various locations throughout the prison. The notice first listed the various practices and conditions at Parchman that were contained in the complaint. This laundry list of alleged abuses was then followed by a section captioned "Your Rights in the Lawsuit." That section explained that inmates would be bound by the results in the *Gates* litigation unless they signed a request for exclusion from the suit. It also stated that:

> If you have additional complaints about conditions or your own treatment at Parchman, you may have your own attorney to represent you, or you may represent yourself, or you may send your complaints to attorneys for plaintiff inmates listed above.

Bogard did not seek exclusion from the *Gates* litigation, although some 380 other inmates at Parchman did opt out. Bogard actually testified in the *Gates* proceedings, and photographs of Bogard's injured foot were introduced into evidence. At a hearing in *Gates* in July of 1971, Bogard stated under oath that he was a plaintiff in the *Gates* litigation.

On October 20, 1972, the district court issued its opinion in *Gates,* granting the plaintiff inmates sweeping declaratory and injunctive relief. The court found that Parchman was unconstitutionally segregated by race, that housing units at the prison were "unfit for human habitation under any modern concept of decency" and unconstitutional, that the defendants "subjected the inmate population to cruel and unusual punishment by failing to provide adequate protection against physical assaults, abuses, indignities and cruelties of other inmates," that inmates were "subjected to constitutionally forbidden cruel and unusual punishment when they have been confined in . . . dark hole cells naked, without any hygienic materials, bedding, adequate food or heat," that punishment procedures at Parchman failed to comport with minimal requirements of due process, and that inmate mail was unconstitutionally censored. The district court then ordered extensive injunctive relief, including the elimination of racial segregation, institution of a classification system to segregate violent from nonviolent inmates, implementation of both short and long range plans for construction of decent housing, sanitation, sewage, water and medical facilities, and commencement of a "rapid elimination of the trusty system." 349 F.Supp. at 887, 898. This court affirmed the district court's actions in their entirety, adopting as its own the lower court's findings of fact and conclusions of law. 501 F.2d 1291, 1322.

The defendants reason that the present suit is barred as res judicata because Bogard could have brought his claims for damage relief in the *Gates* litigation, and his failure to do so violates the rule against "splitting a cause of action." *See* Wright, Law of Federal Courts § 78; *McConnell v. Travelers Indemnity Co.,* 346 F.2d 219, 222 (5th Cir. 1965). Particular reliance is placed on *International Prisoner's Union v. Rizzo,* 356 F.Supp. 806 (E.D.Pa.1973). *Rizzo* was a suit brought by prisoners of the Philadelphia County Prison against various prison and city officials seeking injunctive and monetary relief for constitutional violations stemming from alleged inadequate prison facilities, improper disciplinary practices, lack of sufficient medical care and mail

censorship. Prior to the commencement of their federal court action, prisoners at the Philadelphia prison had maintained a class action seeking only injunctive relief from the same practices in a Pennsylvania state court. In a fashion similar to *Gates,* the Pennsylvania state court after extensive proceedings ordered substantial injunctive relief for myriad violations of constitutional and state law. The federal district court decided that the plaintiff prisoners in the case before it were members of the class of plaintiffs in the state suit, and perfunctorily dismissed all the claims before it for injunctive or declaratory relief. The district court then held that the claims for damages could have been brought as part of the state suit, and therefore were barred on the principle that "a plaintiff must recover all damages arising from given operative facts in a single action when the first forum has the ability to give the relief sought in the second forum." 356 F.Supp. at 810. The reasoning in *Rizzo* is inappropriate in the instant litigation. We agree with the conclusion of the district court that this suit is not barred by res judicata principles.

■ Bogard's stabbing injury occurred on July 7, 1972, two months after the record was closed in *Gates.* The district court's findings were not released until September and the actual judgment not rendered until October of 1972. The defendants nevertheless argue that Bogard should have had the record reopened and had his damage claim litigated as part of the class action. To impose such an obligation on Bogard would in effect impose a three-month statute of limitations on Bogard's stabbing claim. It would forever bar relief to a prisoner because he did not have a class action suit that had been essentially concluded for two months reopened during the time he was recovering from a vicious physical assault that left him a paraplegic. Res judicata does not require such a result and reason forbids it.

■ The summary punishments and the shooting that Bogard complains of did occur in time to be litigated in *Gates,* however, and testimony concerning those incidents was introduced at the *Gates* trial. However, we conclude that inmates at Parchman could not have surmised from the class action notice sent them in *Gates* that they were required to seek monetary relief in that suit or opt out. Furthermore, we have no way of knowing that *Gates* would have been manageable as a class action if individual damage relief had been requested.

Principles of res judicata are not ironclad. I B Moore's Federal Practice ¶ 0.405[1]. This court has frequently stated that res judicata will not be applied when it contravenes an important public policy. *E. g., Johnson v. United States,* 576 F.2d 606, 614 (5th Cir. 1978); *Garner v. Giarrusso,* 571 F.2d 1330, 1336 (5th Cir. 1978). At the very least, Bogard's claims are of sufficient gravity to require that they not be extinguished by his class status in *Gates* unless it can reasonably be assumed that Bogard should have been aware of the possibility that they could have been presented in that suit.

While the notice received by Bogard and the other class inmates at Parchman clearly apprised them of their rights in a suit seeking equitable reform of the Parchman prison, it was insufficient to alert prisoners to the possibility that they could seek individual money damages for personal wrongs. The relief sought was described in one sentence: "Plaintiff inmates ask the Court to order prison officials to correct all of the conditions alleged above." The quoted portion of the section "Your Rights in the Lawsuit" told them that additional complaints about prison conditions or personal treatment could be presented. The defendants listed in the notice—the Governor, the Penitentiary Board, and the Superintendent—were named as defendants because of their power to amend the practices at the prison. *Gates* was never framed or presented as a suit for monetary relief and nothing in the notice sent to the inmates gave any indication that such relief was possible. It would be a harsh and improper application of res judicata to hold, on the basis of the notice sent out in *Gates,* that prisoners forfeited their rights to personal redress for

lack of knowledge that federal law (not followed by the State of Mississippi) required that injunctive and monetary relief be sought in one action.

Nor is it by any means certain that the *Gates* class action would have remained manageable if it had been expanded to include claims for damages by individual prisoners. The real defendant in *Gates* was the Parchman prison itself; all of the district court's energy and attention were (and still are) necessarily focused on the broad expanse of constitutional violations exposed and the proper dimensions of judicial intervention required to correct them. The abuses at the heart of *Gates*—dilapidated housing, inadequate sanitation, food and medical facilities, racial segregation, mail censorship, and the entire trusty system—were broad-based and affected the prisoners as a community.

Claims for individual damage relief, by contrast, would have required separate mini-trials for each prisoner. Because damage relief could only have been sought against officials in their individual capacity, the problem of qualified immunity would have been injected into the suit.[5] The bad faith or malicious intent of the defendants as to each individual claim of each individual prisoner would have required adjudication. Significantly, the district court only certified *Gates* as a Rule 23(b)(1) and (2) class action, and not a (b)(3) action, which would have been the proper classification if joinder of all individual damage claims had been sought. Given the lack of common questions of fact as to many of those claims, and the unmanageability of the suit had they been included, we cannot believe that the district court would have allowed the claims as part of that action if they had been recognized as potentially possible. *Gates* therefore cannot be regarded as precluding the instant suit.

■ Bogard may, on the other hand, avail himself of the findings in *Gates* in establishing certain background facts in the instant suit. Mutuality is not required in this circuit to invoke collateral estoppel. *E. g., Johnson v. United States, supra; Poster Exchange, Inc. v. National Screen Service Corp.,* 517 F.2d 117 (5th Cir. 1975). *See generally, Blonder-Tongue Labs, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Indeed, having adopted the findings and conclusions of *Gates in toto* as this court's own, straight-forward application of stare decisis would preclude reconsideration of the constitutionality of conditions and practices at Parchman. None of the findings or conclusions in *Gates*, however, are outcome-determinative here. The issues posed by the qualified immunity defense were not part of *Gates* and nothing in that suit settled the critical matters in this litigation— the existence of either objective bad faith or subjective intent to cause harm on the part of individual defendants.

### B. *The Statute of Limitations*

■ The defendants also argue that Bogard's suit was barred by the statute of limitations. No federal statute provides any limitation period for actions based on 42 U.S.C. § 1983. Federal courts therefore apply the state limitation period for analogous actions in the state in which the action arose. 42 U.S.C. § 1988; *Ingram v. Steven Robert Corp.,* 547 F.2d 1260, 1261–62 (5th Cir. 1977). The applicable period of limitations is that which the state would have enforced had an action for similar relief been brought in state court. *Sewell v. Grand Lodge of Int. Ass'n of Mach. & Aero Wkrs.,* 445 F.2d 545 (5th Cir. 1971), *cert. denied,* 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674.

■ Appellees urge that Mississippi's one-year statute of limitations for certain intentional torts should apply to Bogard's claims, thus barring relief for all but the stabbing incident of July 7, 1972. Mississippi's one-year statute of limitations reads:

All actions for assault, assault and battery, maiming, false imprisonment, malicious arrest, or menace, and all actions for slanderous words concerning the per-

---

5. *See* Part III, *infra.*

son or title, and for libels, shall be commenced within one year next after the cause of such action accrued, and not after.

Miss.Code § 15–1–35. The one-year limitation period is qualified, however, by Mississippi Code § 15–1–61, which tolls the statute of limitations period for those in Bogard's circumstance in most of the above actions:

> If any person entitled to bring an action for assault, assault and battery, or maiming, shall, at the time the cause of such action accrued, have been in custody as a convict, such person may bring such action within one year after his release.

Since we apply the same limitation period that the State would apply, the tolling section of the Mississippi limitations scheme must be borrowed along with the substantive provision. The defendants attempt to circumvent the tolling statute by characterizing Bogard's suit as one for "menace," which is subject to the one-year limitation period but is not listed as among the actions tolled in § 15–1–61. Bogard's suit is not one for "menace," as that action is customarily defined. *See Dennis v. Travelers Ins. Co.*, 234 So.2d 624, 626 (Miss.1970); 57 C.J.S. Menace p. 1048 (1948). His action is more akin to assault or maiming, both tolled under § 15 -1-61, or an action sounding in negligence, which is covered by Mississippi's general six-year limitation period. § 15 1 49. Bogard's suit is therefore not barred by any applicable statute of limitations.

C. *The Eleventh Amendment and Monell*

The plaintiff brought his suit against the Parchman defendants both in their individual and official capacities. Insofar as the defendants are sued in their individual capacities they enjoy a qualified immunity defense, and as we hold in Part IV, that defense absolves them of individual liability in this case. The plaintiff maintains, however, that when sued in their *official* capaci-

ties, the suit against the defendants becomes in effect a suit against the State of Mississippi.[6] The plaintiff further argues that because the jury's award would be paid by the State itself if the defendants are liable in their official capacities, the defense of qualified immunity would no longer be applicable.

■ The flaw in the plaintiff's argument is that he may not maintain this action against the State of Mississippi. Retrospective monetary relief against a state is barred by the eleventh amendment. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The plaintiff contends that the recent Supreme Court decision in *Monell v. Soc. Serv. of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), has abrogated the state's eleventh amendment immunity when it is sued pursuant to 42 U.S.C. § 1983. Nothing in *Monell*, however, goes that far. The Supreme Court explicitly noted that its *Monell* holding was "limited to local government units which are not considered part of the state for eleventh amendment purposes." 436 U.S. 690, 98 S.Ct. at 2035 -36 n. 54. *See also Hutto v. Finney*, — U.S. — —, 98 S.Ct. 2565, 2580- 81, 57 L.Ed.2d 522 (1978) (Brennan, J., concurring). *Monell* did not discuss *Edelman v. Jordan* and did not overrule it. Since Bogard may not maintain this suit against the state, he may only seek recovery from the defendants as individuals. In that capacity, the qualified immunity defense is fully applicable.

### III. QUALIFIED IMMUNITY

A. *Federal Law*

In *Procuiner v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the Supreme Court held that prison officials sued under 42 U.S.C. § 1983 were entitled to the qualified immunity defense that had previously been recognized in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90

---

**6.** The plaintiff states in his brief that insofar as the suit is against the defendants in their official capacities, the "case is in effect a suit against the State of Mississippi." *See Jagnan-*

*den v. Giles*, 538 F.2d 1166, 1173–76 (5th Cir. 1976) (suit seeking tuition refund for out of state resident against Mississippi State University held to be against State itself).

(1974) (state governor, university president and national guard members) and *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (school board members). *See also O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (superintendent of state hospital).

In *Scheuer* state officials were sued for damages under section 1983 for their involvement in shootings on the Kent State University campus during a Viet Nam antiwar demonstration. The Supreme Court held that a qualified immunity is available to executive officers, increasing in scope with the breadth of the officer's discretion and responsibilities. *See Slavin v. Curry,* 574 F.2d 1256 (5th Cir. 1978). The court stated that the immunity is predicated on "the existence of reasonable grounds for belief formed at the time" of the official's action "coupled with good-faith belief" that the action was proper. 416 U.S. at 247–48, 94 S.Ct. at 1692.

*Wood v. Strickland* clarified the *Scheuer* defense by establishing a dual test for measuring the existence of qualified immunity which requires both an objective and a subjective measurement of official conduct. *See Bryan v. Jones,* 530 F.2d 1210, 1214 (5th Cir. 1976) (en banc). Under the objective test of *Wood,* an official, even if he is acting in the sincere subjective belief that he is doing right, loses his cloak of qualified immunity if his actions contravene "settled, indisputable law." 95 S.Ct. at 1000. *See Schiff v. Williams,* 519 F.2d 257 at 261 (5th Cir. 1975). Thus, an official is liable under section 1983 "if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights" of the person affected. *Id.* 95 S.Ct. at 1001. The fulcrum for this objective first half of *Wood* is the existence, at the time of the official's action, of clearly established judicial decisions that make his action unconstitutional. An official is not "charged with predicting the future course of constitutional law." *Wood,* 95 S.Ct. at 1001, *quoting Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); *see also O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 2495 (1975). *Navarette* brought the objective part of the *Wood* formulation forward without alteration by this language:

> Under the first part of the *Wood v. Strickland* rule, the immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right and if they knew or should have known that their conduct violated the constitutional norm.

98 S.Ct. at 860.

■ Under that second branch of the official immunity doctrine, an official forfeits his immunity, if whatever the objective state of the law at the time of his conduct, his subjective intent was to harm the plaintiff. There is language in *Navarette,* however, that appears to broaden the scope of official immunity under *Wood's* subjective prong. In the language of *Wood,* official immunity would be lost when an official acted "with the malicious intention to cause a deprivation of constitutional rights or other injury" to the plaintiff. 95 S.Ct. at 1001. However, *Wood* did not definitively establish the extent to which conduct less egregious than an affirmative intent to harm— simple negligence, gross negligence or recklessness—would satisfy the subjective "malicious intent" requirement. *Navarette* appears to fill in that deficiency. The holding in *Navarette* squarely establishes that proof of simple negligence is not enough to pierce an official's immunity under § 1983. Dicta by the Court, however, goes much further:

> Neither should petitioners' immunity defense be overruled under the second branch of the *Wood v. Strickland* standard, which would authorize liability where the official has acted with "malicious intention" to deprive the plaintiff of a constitutional right or to cause him "other injury." This part of the rule speaks of "intentional injury," contemplating that the actor intends the consequences of his conduct. *See* Restatement (Second) of Torts, § 8A.

98 S.Ct. at 862. Section 8A of the Restatement (Second) of Torts, which the court cited, distinguishes between intentional conduct, in which "the actor desires to cause the consequences of his act . . . or believes that the consequences are substantially certain to result from it," and reckless conduct, as defined in § 500, in which "the actor does not intend to cause the harm which results from" his conduct, but should realize that there is a "strong probability" that the harm will occur. The Restatement describes the field of conduct between negligence and actual intent as a continuum of probability. Section 8A, Comment b states:

> If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness.

■ In light of the Court's reference to the Restatement, we read the malicious intent prong of the official immunity defense to require proof that an official either actually intended to do harm to the plaintiff, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result. The spirit of the rule reaches nonfeasance as well as misfeasance. It does not insulate an official who, although not possessed of any actual malice or intent to harm, is so derelict in his duties that he must be treated as if he in fact desired the harmful results of his inaction. At the same time, however, the test requires that a plaintiff show that the official's action, although labeled as "reckless" or "grossly negligent," falls on the actual intent side of those terms, rather than on the side of simple negligence.[7]

### B. *Mississippi Law*

■ No court of the State of Mississippi has ruled on the degree of immunity enjoyed by officials of the state penitentiary when sued for damages by a prisoner. We therefore must predict what Mississippi's court system would do if confronted with the case before us. Based upon its past decisions, our forecast is that the Supreme Court of Mississippi would extend to the officials at Parchman substantially the same level of immunity that the United States Supreme Court has applied in *Scheuer, Wood* and *Navarette.*

There are compelling reasons for assuming that Mississippi intends to extend to management level officials at Parchman a degree of immunity coterminous with federal limits. The Mississippi Supreme Court recognized the discretionary nature of the Parchman superintendent's position in *Morgan v. Cook,* 236 So.2d 749 (1970), a habeas corpus case in which the prisoner challenged his confinement in the maximum security

---

7. This Circuit's pre-*Navarette* decisions are not completely harmonious. In *Parker v. McKeithen,* 488 F.2d 553 (5th Cir. 1974), this Court stated that allegations of gross negligence were sufficient to sustain a § 1983 action on facts similar to the instant case. *See also Roberts v. Williams,* 456 F.2d 819 (5th Cir. 1972). In *Burton v. Waller,* 502 F.2d 1261 (5th Cir. 1974), however, the issue was regarded as open. 502 F.2d at 1274 n.6A. Whatever our prior precedent, it must of course yield to *Navarette's* clarification.

The Supreme Court's pre-*Navarette* decision in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) is not inconsistent with our interpretation of *Navarette. Gamble,* without discussing qualified immunity, stated that allegations of "deliberate indifference to serious medical needs of prisoners" would state a valid cause of action against prison officials under § 1983. 97 S.Ct. at 291. *Gamble* does not detract, however, from our holding that something akin to intent to harm is required to satisfy the subjective assay of the qualified immunity defense. "Deliberate indifference" was spoken of by the *Gamble* court as constituting the "unnecessary and wanton infliction of pain." *Id.* at 291. The Court states that such indifference may be manifested by "prison guards in *intentionally* denying or delaying access to medical care or *intentionally* interfering with the treatment once prescribed." *Id.* (emphasis added.) In *Dickson v. Colman,* 569 F.2d 1310 (5th Cir. 1978), a case citing *Navarette,* we emphasized that *Gamble's* "deliberate indifference" standard required *deliberate* conduct. 569 F.2d at 1311–12.

wing of Parchman. Noting that state law vests in the superintendent "the exclusive management and control of the prison system," the court stated that:

> The courts will not interfere with prison rules and regulations unless the rules clearly deprive the prisoner of some fundamental constitutional right. The operation of a prison and the enforcement of its rules and regulations are ordinarily within the sound discretion of the prison administrator.

236 So.2d at 750. We read *Morgan* as evidence of Mississippi's intention to afford the Superintendent at Parchman a discretion limited only by the constraints of federal law. Immunity is a corollary of discretion. *Scheuer* was grounded in the injustice, in the absence of bad faith, of exposing an officer to civil liability when he is required by the state to exercise discretion, and the danger that the threat of such liability would deter the officer's willingness to act with decisiveness and energy in execution of his office. 416 U.S. 232, 94 S.Ct. 1683, 1688. Thus, *Morgan* argues for broad immunity. Indeed, Mississippi could not hope to fill the demandingly important supervisory posts at Parchman with competent personnel without holding out to those officials a measure of protection equivalent to the federal standard.

Against the backdrop of Parchman's unfortunate history, the injustice of exposing Parchman officials to ordinary civil liability applies with special force. In light of the state legislature's intractable neglect concerning conditions at the penitentiary, it would be anomalous in the extreme to ascribe to Mississippi an intention to subject its prison superintendents to uninsulated civil liability while simultaneously forcing them to run Parchman without adequate financial resources, facilities or staffing. Having failed to equip its prison officials with either the money or manpower to initiate reform, it is unlikely that the State would not afford those officials the national standard of immunity for failing to reverse abuses that had gathered from the inertia of years of governmental idlesse.

This Court has on several occasions turned to federal law for guidance in determining the scope of the liability that officials are exposed to under the common law of Mississippi. In *Burton v. Waller,* 502 F.2d 1261 (5th Cir. 1974), a suit arising out of student shootings at the Jackson State College campus, we stated that the liability of the state officials under § 1983 would be no broader but no narrower than liability under Mississippi law. 502 F.2d at 1274 and n.6A. Similarly, in determining the liability of state officers under the common law of Mississippi in *Norton v. McShane,* 332 F.2d 855 (5th Cir. 1964), this Court referred to analogous federal precedent, citing pre-*Scheuer* decisions such as *Gregorie v. Biddle,* 177 F.2d 579 (2nd Cir. 1949); *Spalding v. Vilas,* 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896) and *Barr v. Mateo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

The standard of immunity articulated in *Scheuer, Wood* and *Navarette* is not foreign to the courts of Mississippi. In *Stokes v. Newell,* 174 Miss. 629, 165 So. 542 (1936), a junior high school principal alleged that she was wrongfully fired by the school board for "arbitrary, willful, unlawful, personal, and political motives." 165 So.2d at 543. The Mississippi Supreme Court upheld the sufficiency of her complaint, stating:

> It is true that officers are not liable for the honest exercise of discretionary powers confided to them, but when they go outside their powers and commit wrongs under the color of office, there is liability. They are not given immunity from willful wrongs or malicious acts.

165 So. at 545. Mississippi has also given repeated recognition to a good faith defense in the context of suits against officials for the misuse of public funds. The statement in *Barnett v. Lollar,* 197 Miss. 574, 19 So.2d 748, 749 (1944) is typical:

> At common law a public officer is not liable for errors or mistakes made by him in good faith when acting judicially or quasi judicially within the scope of the subject matter over which he has been given jurisdiction. 46 C.J. 1043, 43 Am. Jur. (Public Officers) § 274.

*See also Cochran v. Eakin,* 203 So.2d 587 (Miss.1967); *Golding v. Slater,* 234 Miss. 567, 107 So.2d 348 (1958); *Poyner v. Gilmore,* 171 Miss. 859, 158 So.2d 922 (1935); *National Surety Co. v. Miller,* 155 Miss. 115, 124 So. 251 (1929); *Lincoln v. Green,* 111 Miss. 32, 71 So. 171 (1916).[8]

Although the plaintiff recognizes that a form of qualified immunity does exist under Mississippi law, he contends that the qualified immunity doctrine is inapplicable in the context of prisons, relying on *Farmer v. State,* 224 Miss. 96, 79 So.2d 528 (1955), *Mississippi v. Durham,* 444 F.2d 152 (5th Cir. 1971), *Roberts v. Williams,* 456 F.2d 819 (5th Cir. 1972) and *Anderson v. Nosser,* 438 F.2d 183 (5th Cir. 1971), *aff'd in part and mod'd in part,* 456 F.2d 835 (5th Cir. 1972 en banc).

*Farmer* was a suit against a county sheriff, brought by the widow of a prisoner who died while in the sheriff's custody. The complaint alleged and the jury found that the sheriff failed, after repeated requests, to take the prisoner to a doctor to receive treatment for serious stomach ulcers, and that the sheriff's failure resulted in the prisoner's death. The Mississippi Supreme Court adopted the position of *Indiana ex rel. Tyler v. Gobin,* 94 F. 48, 50 (C.C.Ind. 1899), which upheld a complaint brought against a county sheriff alleging that the sheriff permitted, aided and abetted a mob in storming the jail house, removing the prisoner, and publicly lynching him. The reasoning in *Tyler,* accepted in *Farmer,* was that if at common law a sheriff is bound to exercise ordinary and reasonable care in the treatment of animals or goods seized by him, he must exercise at least as great a level of care in the treatment of human prisoners. The concept of official immunity was not discussed in the *Farmer* opinion.

In *State of Mississippi v. Durham,* this court was faced with a diversity suit brought by heirs of a prisoner who died in the custody of a county sheriff. The plaintiffs alleged that the prisoner had been beaten by the sheriff and his deputies and died of a resulting cerebral hemorrhage. The court held that procedural errors necessitated a retrial in the case, but offered in dicta guidance to the trial court on the proper duty owed to the prisoner by the sheriff, stating that under *Farmer* the sheriff's duty is one of reasonable care. The next decision to rely on *Farmer* was *Roberts v. Williams,* 456 F.2d 819 (5th Cir. 1972). The suit was brought by a prisoner of a county farm against a trusty guard and superintendent of the county farm for injuries resulting from the discharge of the trusty guard's shotgun into the plaintiff's face. Citing *Farmer,* the court held that the superintendent of the county farm owed a duty of reasonable care to the prisoners in his custody. Finally, in *Anderson v. Nosser,* 438 F.2d 183 (5th Cir. 1971), a panel of this court referred to *Farmer* in the context of the Parchman prison. The one paragraph discussion of the pendent state claim in *Anderson,* however, was deleted from the panel opinion by this Court sitting en banc, for procedural reasons.[9] 456 F.2d 835, 838 (1972). The deleted panel discussion had held that the treatment given to civil rights protestors being detained at Parchman's maximum security unit— treatment that the panel regarded as violative of both the eighth amendment and due process and the en banc court regarded as "summary punishment without any semblance of due process" violated Mississippi law. Although the deleted panel discussion cites *Farmer, Roberts,* and the Mississippi statute that requires the superintendent to properly care for prisoners, it did not articulate any precise standard of care. Since the treatment in *Anderson* obviously would have pierced even the strictest post-*Navar-*

---

**8.** A recent Mississippi Supreme Court decision. *Davis v. Little,* 362 So.2d 642 (1978) acknowledged the existence of a "limited immunity" defense in instances in which an official's "performance of his lawful duties requires 'personal deliberation, decision and judgment'," *citing* Prosser, Law of Torts § 132 (4th ed. 1971).

**9.** The deletion was made because the issue was not submitted to the jury, and because it "was not an ultimate issue in the case." 435 F.2d at 835.

*ette* immunity, no such articulation was necessary.

*Farmer* and the three subsequent decisions of this court are all at least technically distinguishable from the instant suit. *Farmer* and *Durham* simply apply a common law rule applicable to sheriffs, who are usually charged with the care of relatively few prisoners, many of whom are pre-trial detainees. The reference to state law in the original *Anderson* opinion was deleted by the en banc court, did not set forth a specific standard of care, and involved misconduct sufficient to overcome the toughest defenses against malicious intent and bad faith. *Roberts* is most in point. Although the superintendent in *Roberts* was in charge of a county-level institution holding less than 30 prisoners, the decision does extend *Farmer* past the limited common law rule for sheriffs operating county jail institutions.

Rather than seeking to divine an unarticulated distinction between county prisons and a penitentiary, we note that all of the above cases were decided prior to *Scheuer v. Rhodes,* at a time when the doctrine of qualified immunity was in its appellate court infancy. *Farmer,* decided twenty years before *Scheuer* and dealing with a situation radically different from the job of managing the Parchman prison, would surely not be applied to a Parchman superintendent by the Mississippi Supreme Court. In light of the general acceptance of official immunity in Mississippi law, the Mississippi Supreme Court's explicit acknowledgment in *Morgan* of the breadth of discretion vested in the Parchman superintendent, the importance to Mississippi of attracting competent and energetic leadership at Parchman, and the persuasive intervening authority of *Scheuer* and its progeny, we have no difficulty stating that the defendants are entitled to a *Scheuer*-type qualified immunity defense under state law.

## IV. THE DIRECTED VERDICT

The district court directed a verdict in favor of Cook, Collier and Byars on the issue of whether their conduct rose to the level of willful, wanton or gross negligence. That verdict on the qualified immunity issue must be evaluated in light of *Wood* and the subsequent gloss of *Navarette.* Inquiry must be made into the subjective intent of Cook, Collier, and Byars, and the objective reasonableness of their actions when compared to the state of constitutional law concerning prisoners and prison conditions during the period from 1969 to 1970.

Under the standard adopted in *Boeing v. Shipman,* 411 F.2d 365 (5th Cir. 1969), on motions for directed verdict and judgments notwithstanding the verdict, the court is required to consider all of the evidence on both sides in the light of all reasonable inferences drawn most favorably to the non-mover. There must be a conflict in substantial evidence to create a jury question. A mere scintilla of evidence is insufficient, but the directed verdict should not be decided merely by which side has the better of the case. The court must believe that reasonable men could not arrive at a contrary verdict.

Only Cook is implicated by the jury's verdict in the shooting, and only Collier in the stabbing; Cook and Byars are implicated in the summary punishments.[10] The evidence regarding the defendant's qualified immunity will be discussed separately with regard to each claim.

### A. The Shooting

■ On February 25, 1971, the day Bogard was shot, Thomas Cook was Superintendent at Parchman. Cook was not present at the location of the shooting or in any sense directly involved in the incident. Bogard attempts to affix liability on Cook for the shooting by alleging that his injury was caused by Cook's failure to properly

---

10. Collier is not implicated in the shooting or the summary punishments because those incidents occurred prior to his assumption in office. The jury found that Cook was not implicated in the stabbing, which took place after he left Parchman. Byar's negligence was found by the jury not to be a proximate cause of either the shooting or stabbing, leaving him potentially liable only for the summary punishments.

administer the trusty guard system in the face of knowledge by Cook that the system was corrupt, disorderly and fraught with violence. Specifically, Bogard cites evidence that inmates were selected for the job of trusty shooter through a system of payoffs, favoritism and extortion, that those selected were often either serving time for crimes of violence, were mentally retarded or were suffering from psychological disorders, that after selection those chosen were not trained in the use of firearms or instructed as to proper procedures for the handling of an event such as an inmate "buck," and that the ultimate product of the system was a regime of incessant armed violence on the part of the trusty shooters.

*Gates* established that the picture Bogard paints of the trusty shooter system is an accurate one:

> Penitentiary records indicate that many of the armed trusties have been convicted of violent crimes, and that of the armed trusties serving as of April 1, 1971, 35% had not been psychologically tested, 40% of those tested were found to be retarded, and 71% of those tested were found to have personality disorders. There is no formal program at Parchman for training trusties and they are instructed to maintain discipline by shooting at inmates who get out of the gun line; in many cases, trusties have received little training in the handling of firearms. Inmates have, on many occasions, suffered injuries and abuses as a result of the failure to select, train, supervise and maintain an adequate custodial staff. Trusties have abused their position to engage in loan-sharking, extortion and other illegal conduct in dealing with inmates subject to their authority and control. The evidence indicates that the use of trusties who exercise authority over fellow inmates has established intolerable patterns of physical mistreatment. For example, during the Cook administration, 30 inmates received gunshot wounds, an additional 29 inmates were shot at, and 52 inmates physically beaten.

349 F.Supp. at 889. It is no less accurate to state that the deplorable state of the trusty system was a proximate cause of Bogard's shooting injury and that Cook was negligent in performing his duty to properly administer the system. The jury specifically found that Cook was negligent in his duties and that Cook's negligence was a proximate cause of the shooting.

To hold Cook personally liable, however, Bogard must overcome Cook's qualified immunity. The district court held that there was insufficient evidence to create a jury question on whether Cook was guilty of anything worse than negligence. Applying the *Navarette* qualified immunity formulation, we agree with the district court that a directed verdict was proper.

The indiscriminate violence of the trusty shooters at Parchman was primarily the result of factors endemic to the trusty system itself. Although the jury could properly have found that Cook's failings as an administrator exacerbated an already corrupt and disorderly system, Cook's complicity in failing to correct abuses does not rise to the level of reckless conduct, and certainly falls short of the malicious intent required by *Wood* and *Navarette*. At the time of Cook's administration, state law restricted the superintendent to 150 civilian employees with whom to operate the prison, and only about 30 of those employees could feasibly be allocated to the actual work of guarding inmates.[11] The nearly 2000 felons housed at Parchman were crammed in rundown and unsanitary quarters, and the superintendent had no funds or authorization to alleviate those explosive physical conditions. State law required Cook to use inmates to guard other inmates, but the legislature appropriated no money for obtaining the necessary staffing or expertise to psychologically test inmates for the position. The physical separation of the 12 residential camps necessitated that actual day-to-day supervision of prisoners be committed to the residential camp sergeants, and that selection for trusty status and demotions to

---

11. The restriction was codified at Miss.Code § 7962 (1942), now § 47–5–41 (1972).

the gunman level be placed largely in their hands. Corruption and violence within the trusty system at Parchman were entrenched by years of operation under these conditions.

The only meaningful solution to the problems of the trusty system was its total elimination, the result ordered in *Gates.* If Cook had had at his disposal the means to eliminate the violent system but failed to do so, that failure would clearly make a jury issue as to whether it amounted to the malicious intent described in *Navarette.* But Cook was not only unauthorized to institute the only reform that would have been likely to eliminate the type of shooting suffered by Bogard, he was largely unable to take any meaningful intermediate step. Proper selection and adequate training of trusty shooters at Parchman was delegated by necessity to camp sergeants. If Cook failed to do the best he could with what he had, his failure was largely his admitted lack of control over those sergeants. In his brief Cook acknowledged that each sergeant "was almost like a warden of a separate unit," and that the sergeants were protective of their independence and "resented interference from the administration building." Although the jury found that Sergeant Childs at Camp Eight was not grossly negligent in his duties—a factor that tends to blunt Bogard's assertion that Cook was grossly negligent in delegating responsibility to him—the record and the findings in *Gates* support the inference that it was the unbridled tyranny of camp sergeants at Parchman that fueled much of the violence there. Yet, given the financial resources and limitations on the number of guards he could hire, the Parchman superintendent could do little more to hire high quality camp sergeants than he could to eliminate the trusty system or build new housing. Superintendent Cook's administration of Parchman was not a paragon, but nothing in the record showed it to be anything more than an inability to cope with a virtually hopeless situation, which the jury equated with a negligent failure to do as good a job as could reasonably have been done under these limitations.

## B. *The Stabbing*

■ Slicker Davis' vicious stabbing of Bogard on July 7, 1972, like Bogard's shooting injury, is more an indictment of Parchman itself than a result of personal involvement by prison supervisors. Bogard attempts to establish the liability of Superintendent Collier by asserting that Collier should have employed either metal detectors or frequent body searches to eliminate the widespread possession by inmates of weapons such as Slicker Davis' knife, that Collier should have provided for the segregation of violent inmates such as Slicker Davis from nonviolent inmates like Bogard, and that Bogard should not have been required as part of his duties as half-trusty to supervise inmates such as Slicker Davis when such contact was an obvious and predictable source of resentment and violence.

As in the case of the shooting, the causative factors Bogard lists for his stabbing are essentially accurate. There is no disputing the existence of the widespread possession of weaponry at Parchman, the failure to insulate the nonviolent from the violent or disturbed, and the charged atmosphere of resentment, suspicion and retaliation that was created by putting inmates in charge of other inmates. In *Gates* it was stated that:

> Defendants have failed to properly classify and assign inmates to barracks, resulting in the intermingling of inmates convicted of aggravated violent crimes with those who are first offenders or convicted of nonviolent crimes. . . .

> Although many inmates possess knives or other handmade weapons, there is no established requirement or procedure for conducting shakedowns to discover such weapons, nor is possession of weapons reported or punished. At least 85 instances are revealed by the record where inmates have been physically assaulted by other inmates. Twenty-seven of these assaults involved armed attacks in which an inmate was either stabbed, cut or shot.

349 F.Supp. at 888–889. The jury found that Collier's own negligence was a contrib-

uting cause to the stabbing, but it strains credibility to assert that his failures to curb the possession of arms, properly classify inmates, or do away with the trusty system were in any sense the product of a subjective intent to cause harm.

Collier was no less constrained by state law than Cook in being forced to use the trusty system. Allowing inmates such as Bogard to be used as half-trusty "hallboys" may have contributed to problems at Parchman, but half-trustys were necessary if Parchman were to be run. Mississippi, with its limit on money and guards, mandated that inmates should help run their own prison; the resentment which that requirement spawned was inevitable and beyond Collier's control.

In hindsight it is obvious that it was a mistake to put Bogard and Slicker Davis in close contact. It is not clear, however, that the mistake can even be attributed to Collier, and it is definitely clear that if it was attributable to him, the mistake in no sense partook of an intent to harm Bogard. Camp 2, where Davis was housed, was reserved for those inmates suffering from a physical disability or who because of age or other infirmity were otherwise unable to perform Parchman's normal routine of farm work. Slicker Davis was apparently confined to Camp 2 because of an infectious disease. Davis had already been assigned to Camp 2 when Collier took over as Superintendent. Bogard's assignment to Camp 2 was also made prior to Collier's assumption of duties, that assignment followed as a matter of course after Bogard's shooting injury. Prior to the stabbing, there were no adverse reports concerning either Bogard or Davis which could have brought either man to Collier's attention, and Collier had apparently had no contact with either inmate before that date. Several experts testified that on the basis of Slicker Davis' file they would not have ordered him separated from other inmates. Collier's failure to examine Davis' file and then segregate

Davis on his own initiative when no precipitating event had brought Davis to his attention can certainly not be characterized as the type of action or inaction which *Navarette* would condemn. It may well be that Parchman was generally deficient in its psychological testing of inmates and in its lack of physical facilities for the separation and supervision of the violent or disturbed, but as in the case of all the other major shortcomings of the prison, the primary cause was neglect by the State itself.

As to the issue of weapons control, there was expert testimony that weapon possession is a problem in all prisons, and that prison administrators across the country have had only limited success in coping with the problem. Some prisons have installed airport-style weapons detectors and then abandoned their use because they fail to significantly reduce weapon possession. The record raises a substantial doubt as to whether metal detectors, had Collier decided to use them, and had he possessed funds to purchase them, would have even been obtainable. *See* 405 F.Supp. at 1211–12. Frequent physical searches are apparently the most effective means of combatting weapon possession, but a level of possession persists even under that method. The record shows that weapons searches did take place from time to time. Although weapons possession at Parchman was widespread and Collier appears to have taken no effective steps to bring it under control, his fault was not shown to be any worse than a negligent failure to adopt the best choice among the alternatives at his disposal.

### C. *The Summary Punishments*

 The summary punishments Bogard complains of were of three types: incarceration in the punishment cell of the maximum security unit, incarceration in the dark hole, and the coke crate punishment. The incidents all occurred between June of 1969 and October of 1970.[12] The punishments were alleged to be cruel and unusual,

12. The summary punishments apparently ceased after Bogard's shooting injury and assignment to Camp 2.

and inflicted without proper procedural due process.

Bogard alleged that he was placed in a cell in the punishment wing of the maximum security unit six different times, for periods from two to thirty days. On at least two occasions, he claims, he was stripped naked when placed in the punishment cell, and as a matter of routine he was fed only once per day when confined there. In one instance he was allegedly confined in the punishment cell for three days and fed only once for the infraction of playing his radio too loudly. Bogard asserts four separate confinements in the dark hole, all for periods of 24 hours. Each confinement included being stripped naked and having his head shaved with heavy duty clippers that he characterizes as sheep shears. Bogard complains of only one subjection to the coke crate punishment. The punishment was allegedly ordered by his residential camp sergeant for Bogard's failure to pick cotton fast enough; it consisted of being forced to stand on top of a coke crate box for an entire work day, for three consecutive days. These punishments are alleged to be cruel and unusual in their own right, and administered for petty offenses disproportionate to their severity. The dark hole and coke crate punishments were claimed to have been inflicted without any due process safeguards.

There is ample evidence in the record that the punishment practices Bogard complains of were in routine use during the 1969–1970 period at Parchman. *Gates* established a lack of procedural due process in the use of severe punishments, and the fact that, as they were administered, the dark hole and punishment cell violated the eighth amendment. *Gates* also explicitly found that the Parchman superintendent and other prison officials acquiesced in the unconstitutional punishment procedures:

Mr. Cook defended the use of the dark hole as a necessary type of psychological punishment for inmates who are obstreperous, obstinate violators of penitentiary discipline, and favored that method in preference to inflicting corporal punish-

ment by the lash. When this action was begun, however, the practice was to place inmates in the dark hole naked, without any hygienic materials, and often without adequate food. It was customary to cut the hair of an inmate confined in the dark hole by means of heavy-duty clippers described by inmates as sheep shears, which in some cases resulted in injury. Under the present practice inmates have frequently been kept in the dark hole for 48 hours and may be confined therein for up to 72 hours. While an inmate occupies the dark hole, the cell is not cleaned, nor is the inmate permitted to wash himself.

Although Superintendents Cook and Collier have issued instructions prohibiting mistreatment in the enforcement of discipline, the record is replete with innumerable instances of physical brutality and abuse in disciplining inmates who are sent to MSU [Maximum Security Unit]. These include administering milk of magnesia as a form of punishment, stripping inmates of their clothes, turning the fan on inmates while naked and wet, depriving inmates of mattresses, hygenic materials and adequate food, handcuffing inmates to the fence and to cells for long periods of time, shooting at and around inmates to keep them standing or lying in the yard at MSU, and using a cattle prod to keep inmates standing or moving while at MSU. Indeed, the superintendents and other prison officials acquiesced in these punishment procedures.

349 F.Supp. at 890.

The testimony of Cook and Byars indicates that they were fully aware of the nature of the dark hole and punishment cell and the indignities incident to those punishments. Head shaving with heavy clippers, for example, was defended by Cook as a badge of infamy that increased the psychological effectiveness of the dark hole; stripping of inmates for punishment was allegedly done for the inmates' own protection. Byers admitted in this testimony that he was aware of the use of the coke crate punishment at Camp 8, as well as the use of camp punishments at other residential camps.

The jury found that Cook and Byars had subjected Bogard to cruel and unusual punishment and deprivations of due process. The jury did not answer the question which asked whether Bogard suffered injury as a result of these constitutional violations but the jury did award him a total of $80,000 damages for the due process violations and cruel and unusual punishments. When the jury's verdict and the findings in *Gates* are combined, the result is a conclusion that Cook and Byars were personally involved in subjecting Bogard to constitutional violations.

The qualified immunity issue is more complex in the context of the summary punishments than in the context of the stabbing or shooting. Virtually by definition, infliction of the punishments involved a subjective intent to cause harm. Cook and Byars knew what the punishments consisted of, and in the case of punishments such as the dark hole, had to personally authorize each instance of their use. Harm, in the sense of "teaching an inmate a lesson," was the obvious objective of punishment at Parchman. If intent of this sort is enough to satisfy the subjective prong of *Wood* and *Navarette,* the ultimate finding that the punishments were unconstitutional would complete the establishment of the defendant's liability.

To define the defendant's subjective state of mind by a mechanical equation of punishment with intent, however, would ultimately eliminate the qualified immunity defense in the context of eighth amendment violations. If intent to harm is involved in any punishment that later turns out to be unconstitutional, the effect is to accomplish what the *first* prong of *Wood* specifically forbids: the imposition of liability for the failure to predict the future course of constitutional law. *See Wood,* 95 S.Ct. at 1001; *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 2495, 45 L.Ed.2d 396 (1975); *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). If Cook and Byars could not have known in 1969–1970 that the punishment practices at Parchman were unconstitutional, they may not now be held liable merely because pun-

ishment inherently tends to connote an intent to cause harm. The record does not support any assertion that Cook or Byars harbored any subjective malicious desire to "get" Bogard as a specific individual. The overall subjective intent inquiry thus requires a limited objective inquiry into what Cook and Byars should have known about the legality of the punishments they sanctioned. Only if the punishments suffered by Bogard were clearly unconstitutional in 1969–1970 can it be said that Byars or Cook acted in bad faith. Under this formulation of the qualified immunity issue, it can be seen that the liability of the defendants for the summary punishments does not turn on a jury question at all. Since no issue of particularized malice toward Bogard was present, the only factual issues were the actual existence of eighth amendment and due process violations against Bogard—issues which the jury resolved in Bogard's favor. Whether the defendants should have known that their conduct violated the constitution is a purely legal inquiry that may be determined on this appeal.

In 1969 and 1970, there was yet to be a decision of either this court, the Mississippi Supreme Court, or the United States Supreme Court that could have alerted the defendants that the punishments Bogard suffered were unconstitutional. At that time, federal courts were still generally reluctant to interfere with prison administration. The so-called "hands off" doctrine, *see* 18 A.L.R.Fed. 7 (1974), usually resulted in the denial of relief under federal civil rights acts for practices such as corporal punishment, punitive segregation, or harsh confinement conditions. *E. g., Beard v. Lee,* 396 F.2d 749, 751 (5th Cir. 1968); *Hayes v. Russell,* 405 F.2d 859 (5th Cir. 1969); *Granville v. Hunt,* 411 F.2d 9 (5th Cir. 1969); *Flint v. Wainwright,* 433 F.2d 961, 962 (5th Cir. 1970). *See generally* cases cited in 18 A.L.R.Fed. 7, 19–21 (1974). The first hint by this circuit that change was in the wind came in *Novak v. Beto,* 453 F.2d 661 (5th Cir. 1971). *Novak* denied a Texas prisoner's § 1983 claim of cruel and unusual punishment for incarceration in a solitary

confinement cell similar to the maximum security wing's punishment cell at Parchman. The prisoner was unsuccessful in *Novak*, but the court for the first time intimated that review of confinement practices in prisons were not totally beyond the pale of judicial scrutiny and intervention:

> In view of the recent tragic incidents in this Nation's prisons and of the frequent assertions of the inadequacy of our penal systems, the burden of judging weighs upon us more than usual as we turn to appellant's contention that solitary confinement as administered by the TDC is cruel and unusual punishment . . . [W]e are deeply troubled by the lightless cell, the limited bedding, and the minimal food provided prisoners in solitary confinement in Texas.

453 F.2d at 665. *Novak* is evidence that although national awareness of intolerable prison conditions was beginning to take shape during the time in which Bogard was subjected to summary punishments, (*see also Holt v. Sarver,* 300 F.Supp. 825 (E.D. Ark.1969), courts were not yet ready to intervene in any significant way. *See* 18 A.L.R. Fed. 7, *supra,* 19–21. The grant of relief in prisoner suits of this type did not begin in this circuit until 1972. *E. g., Rocha v. Sowers,* 454 F.2d 1155 (5th Cir. 1972); *Campbell v. Beto,* 460 F.2d 765 (5th Cir. 1972); *Hutchens v. State of Alabama,* 466 F.2d 507 (5th Cir. 1972). *See also Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). It was *Gates v. Collier* in 1974, however, that first marked a broad-scale intervention by this court in the supervision of prison practices.

1974 also recorded the Supreme Court's most meaningful recognition of due process rights of prisoners in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), but the Court expressly held that *Wolff's* new pronouncement should not be given retroactive effect. This court's decision affirming the district court in *Gates* was held in abeyance pending the decision in *Wolff, Gates v. Collier,* 501 F.2d at 1295 (1974), further attesting to the unsettled state of the law prior to that decision.

Experts testified that punishments such as the dark hole were in common use in prisons around the country in 1969–1970. We acknowledged the national use of punishment cells similar to Parchman's in *Novak.* 453 F.2d at 665. *See also Poindexter v. Woodman,* 510 F.2d 464, 465 (10th Cir. 1975) (noting the prevalence of solitary "strip cell" confinement in United States prisons). Clearly, the dark hole and punishment cells were long established procedures at Parchman. Perhaps most telling of all, Mississippi law expressly authorized use of the dark hole punishment for up to 24 hours. Miss. Code § 47–5–145. The defendants cannot be held liable for failing to predict that an existing state statute would later be found constitutionally deficient. *See Jagnanden v. Giles,* 538 F.2d 1166, 1173 (5th Cir. 1976). In short, the law of 1970 was not highly protective of prisoners' rights and courts were reluctant to intrude into the prison administrator's domain. The defendants cannot reasonably be charged with knowledge that the punishment practices at Parchman were unconstitutional.

## V. CONCLUSION

Bogard proved his case against Parchman itself, but not against the individual defendants. The state was not and could not be brought before this Court, however, and it does not serve the ends of justice to fix monetary accountability on the state's employees when they did little more than administer their positions during a time of state perpetuation of intolerable conditions over which they had no meaningful control. The absence of evidence in the record of malicious intent by prison officials, and the still dormant state of judicial recognition of prisoners' rights in 1970 establishes that they were entitled to the defense of official immunity, which, as the district court correctly held, precluded their liability.

AFFIRMED.

VANCE, Circuit Judge, Concurring in Result:

I concur in the result expressed in the opinion of the court but I reach that result by a slightly different path.

Over fifty years ago the Supreme Court held,

> If the federal courts are to have the jurisdiction in class suits to which they are obviously entitled, the decree when rendered must bind all of the class properly represented.

*Supreme Tribe of Ben Hur v. Cauble*, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921). Bogard makes no claim that his interests were not adequately protected in *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss.1972), aff'd., 501 F.2d 1291 (5th Cir. 1974). He was an active participant in the prior case. Its legal and factual bases were virtually identical to those of the case now before the court. Although the class certification in *Gates* was under Rule 23(b)(1) and 23(b)(2), class members, including Bogard, were given actual written notice and the opportunity to exclude themselves. As Judge Clark's opinion points out, 380 class members elected to opt out but Bogard did not make such an election. Under this state of facts I would hold that the doctrine of *res judicata* bars a second, money damage claim by Bogard covering the same period. *See generally Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1973); *International Prisoners' Union v. Rizzo*, 356 F.Supp. 806 (E.D.Pa.1973).

The separate claim involving the stabbing injury, which occurred after the evidence was closed in *Gates,* is not barred. With respect to that injury I agree that misconduct by Cook, Collier and Byars of the quality required to overcome their qualified immunity was not proved.